840 A.2d 188

**Bonnie L. CORBY**

v.

**Daniel P. McCARTHY.**

**No. 00037, Sept. Term, 2003.**

Court of Special Appeals of Maryland.

Dec. 30, 2003.

448

Ronald L. Ogens (Michael Reuter, Deckelbaum, Ogens & Raftery, Chtd. on the brief), Bethesda, for appellant.

Charles F. Morgan (Hodes, Ulman, Pessin & Katz, P.A. on the brief), Towson, for appellee.

Argued before HOLLANDER, SHARER and CHARLES E. MOYLAN, JR., (Retired, specially assigned), JJ.

HOLLANDER, Judge.

This case, which is before us for the second time, has a protracted history rooted in an ongoing dispute regarding parental support for the parties' adult disabled child. Bonnie Corby,[1] appellant and cross-appellee, and Daniel P. McCarthy, appellee and cross-appellant, are the divorced parents of Kelly McCarthy, who was born in January 1980. Appellee has paid child support for Kelly since the parties' divorce in 1982.

This appeal involves a "Supplemental Motion To Modify Child Support," filed by appellant on June 6, 2002, in the Circuit Court for Montgomery County, seeking an increase with respect to appellee's monthly support obligation of $702. In response, appellee asked the court to terminate his support obligation or, in the alternative, to reduce it. Following an evidentiary hearing in February 2003, the circuit court concluded that Kelly is a destitute adult child within the meaning of Md.Code (1999 Repl.Vol.), § 13–101(b) of the Family Law Article ("F.L."). In its Modification Order filed February 24, 2003, however, the circuit court reduced appellee's support obligation to $150 per month, retroactive to August 1, 2002. That ruling spawned this appeal.

Appellant contests the decision of the circuit court reducing appellee's monthly support obligation to $150. Appellee challenges the circuit court's finding that Kelly is a destitute adult child. He also asks us to revisit the ruling of this Court in the first appeal, *McCarthy v. McCarthy*, No. 423, September

---

1. Appellant was previously known as Bonnie McCarthy. We shall refer to her by the name she now uses.

Term 2000 (filed August 28, 2001) ("*McCarthy I*"), in which the Court (Murphy, C.J.) determined that the Child Support Guidelines (the "Guidelines"), set out in F.L. § 12–202, apply in calculating the child support obligation for a destitute adult child.

Appellant presents the following five questions:

I. Did the Trial Court err when it compelled the destitute adult child to relinquish the autonomy and benefits of residing in her own apartment?

II. Did the Trial Court violate the Mother's Constitutional rights against State ordered involuntary servitude, when it ordered the destitute adult child to live with the disabled Mother?

III. Did the Trial Court err when it Ordered the Mother to provide shelter and support for the destitute adult child contrary to the statutory authority granted pursuant to FL § 13–103 and the statutory requirements of FL § 12–202 and § 12–204?

IV. Did the Trial Court err in disallowing those costs specifically authorized by FL § 13–103(c)(2), when it ruled that it was in the best interest of the destitute child to receive child support at a level significantly below the child support guidelines amount established by FL § 12–204?

V. Did the Trial Court err when it found that the destitute adult child's expense for a car was unreasonable?

With respect to the cross-appeal, appellee asks:

I. Did the trial court err when it held that Kelly McCarthy is a "destitute adult child" within the meaning of Md.Code Ann., Fam. Law § 13–101(b)?

II. If Kelly McCarthy is a "destitute adult child," was the trial court required to apply the child support guidelines?

III. If the child support guidelines do not apply to a "destitute adult child," was the trial court's award of support for Kelly McCarthy within the Court's discretion and not clearly erroneous under *Presley v. Presley*, 65 Md.App. 265, 500 A.2d 322 (1985)?

For the reasons that follow, we shall vacate the court's Modification Order of February 24, 2003, and remand for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

The parties were married in May 1978. Their only child, Kelly, was born on January 28, 1980. Upon the parties' divorce in August 1982, appellant was awarded sole custody of Kelly.[2]

McCarthy has worked almost thirty years for the federal government. In his current position as a health insurance analyst for the Medicaid and Medicare Administration, he earns $2,861.60 biweekly, or almost $75,000 annually. McCarthy remarried about thirteen years ago, and his wife, Jeanne, earns about $1000 per week, exclusive of a bonus. They adopted their only child in 1997.

Ms. Corby does not work. In 1998, the Social Security Administration determined that she is disabled, and she now receives Social Security disability benefits of $540 per month. There is no suggestion that appellant is able to contribute to the financial support of Kelly.

On October 29, 1997, shortly before Kelly turned eighteen, appellant filed a motion in the circuit court to extend McCarthy's support obligation beyond Kelly's eighteenth birthday. The master held a two-day evidentiary hearing in February 1998, at which expert testimony was presented with respect to Kelly's disability. At the time of the hearing, Kelly was a special education student at Walter Johnson High School. She was also working part-time at the Department of Veterans Affairs ("VA"), earning $404 bi-weekly while receiving $73 in monthly SSI benefits.

In the master's report of June 9, 1998, the master recommended the extension of parental support for Kelly beyond her eighteenth birthday. As to Kelly's condition, the master

---

**2.** For reasons not pertinent here, appellee has not had a relationship with Kelly since she was five years old.

found that she is a "mildly mentally retarded woman who functions at a 4th or 5th grade level." She also has "great difficulty reading at a 4th grade level," and has "no understanding of the language presented." Moreover, the master noted that all of the experts who testified "agreed that Kelly does not have the life skills to live on her own . . . ." In addition, the master found that Kelly lacked the capacity to "obtain and maintain continuous long term employment generating sufficient income to cover her reasonable needs." Further, the master wrote:

> Dr. Steven Weinstein, a pediatric neurologist, testified that unlike a 4th or 5th grade child, Kelly has no ability to "problem solve" if new information is presented from the previous learning path. Although some people at Kelly's level will work full time, they will not be able to live independently, i.e. live unassisted in the world. People such as Kelly need close supervision in their home for such tasks as food preparation, dressing, and paying bills. People such as Kelly need support to go to and from employment and usually live at home with a parent or in a halfway house where assistance with daily living needs is available. . . .

The master determined that Kelly's needs amounted to about $1,000 a month. He then imputed annual income to appellant of $20,000, and found that appellee had an annual income of about $60,000. Using the Guidelines, the master recommended that appellee pay child support of $634 per month. As no exceptions were filed, the court issued an Order of June 25, 1998, extending appellee's support obligation and requiring him to pay $634 per month towards Kelly's support.

A few months later, on November 23, 1998, Corby filed a petition to modify and increase child support, claiming a change in circumstances based on an increase in appellee's income and a finding by the Social Security Administration on July 25, 1998, that she is disabled. Thereafter, on June 18, 1999, McCarthy filed a motion to terminate support, claiming that, since the hearing in February 1998, Kelly had obtained

full-time employment with the VA, and her annual income had increased from $8,700 to $16,600.

The master heard the parties' motions on October 12, 1999. Then, on November 15, 1999, the master issued a Report and Recommendation, finding a material change in circumstances based on "the nature and extent of the child's employment." Whereas Kelly had been employed in February 1998 as a temporary and probationary employee with the VA, working twenty hours per week and grossing $299.60 bi-weekly, she was a permanent and full-time VA employee by the time of the 1999 hearing. Her income had increased to gross monthly earnings of $1,382.50, from which she netted $995.40. On an annual basis, Kelly was earning a gross wage of $16,590. Because of her employment, however, Kelly was no longer receiving $73 in monthly Social Security benefits.

Recognizing that, since the last hearing, Corby had been found disabled by the Social Security Administration, the master declined to impute income to appellee. He reasoned that it would be "equal to forcing a person living at a subsistence level, pursuant to a federal welfare program, to pay child support." Conversely, the master found that appellee's income had increased to $5,269 per month, or $63,228 per year.

The master concluded that Kelly was a destitute adult child and that the Guidelines apply in calculating parental support. But, he recommended a downward deviation from the guidelines, based on his finding that Kelly could meet most of her reasonable monthly expenses, which included half the rent for the apartment that Kelly was then sharing with appellant. The master reasoned that "[i]t is not in the best interest of this child to provide the full amount of child support which would artificially establish a standard of living beyond Kelly's means." Therefore, although appellee's child support obligation under the Guidelines would have been $681 per month, the master recommended the reduction of appellee's support obligation to $100 per month.

Both parties filed exceptions. In a Memorandum Opinion of March 27, 2000, the court concluded that the Guidelines do not apply to a destitute adult child, but it otherwise adopted the master's recommendations. The court stated, in part:

Plaintiff [i.e., Corby] alleges that the Master erred in departing from the Child Support Guidelines. The Court does not find this to be error for two reasons. Initially, the Court is not cited to any authority that the child support Guidelines apply in cases where an adult destitute child is involved. Family Law 13–107(b) provides that in determining the amount of support, the court shall consider the financial circumstances of the individual.

Kelly is employed earning approximately $16,000 per year. The Child Support Guidelines do not take these matters into account. In addition, she requires and receives other assistance and subsidies.

The court believes that the proper method to determine the level of support is to determine the reasonable needs of the adult child and consider the ability of the child to meet those needs. If the child is unable to meet her reasonable needs then the Court looks to the ability of the parents to contribute to those needs.

On the same date, March 27, 2000, the circuit court entered a Modification Order requiring McCarthy to pay child support to Corby in the sum of $100 per month, commencing from November 1, 1999. That ruling culminated in *McCarthy I.*

On appeal, appellant asked: "Did the trial court err in refusing to utilize the child support guidelines in determining child support for an adult disabled child?" This Court expressly held that "the Child Support Guidelines are applicable to adult destitute children." Therefore, we vacated the circuit court's decision and remanded the matter to the circuit court to determine "Kelly's right to parental support by applying the Child Support Guidelines."

In concluding that the Guidelines applied, Chief Judge Murphy wrote for the panel in *McCarthy I:*

The record in this case clearly shows that Kelly is very limited and unable to live independently without assistance from her mother.... In 1998, the Master found that Kelly is "mildly mentally retarded," functioning on a fourth or fifth grade level, and "that this child does not have the mental capacity to seek out, obtain, and maintain continuous long term employment generating sufficient income to cover her reasonable needs."

\* \* \*

We are persuaded that the Child Support Guidelines are as applicable to a "destitute adult child" as they are to a minor child. Any other interpretation would be inconsistent with the well established requirement that "the procedure and remedies for the enforcement of [an incapacitated adult child's] right [to parental support] must ... be 'on equal footing' [with a minor child's right to parental support.]" *Stern v. Stern,* 58 Md.App. 280, 295, 473 A.2d 56 (1984). (omissions in original).

\* \* \*

In accordance with [Md.Code Ann. Fam. Law § 12–202(a)(2)(iv) ], a circuit court may only depart from the mandatory child support guidelines when it justifies that departure, in writing, and clearly articulates why the departure "serves the best interest of the child." *In re: Joshua W.,* 94 Md.App. 486, 492, 617 A.2d 1154 (1993). *See also, Dunlap v. Fiorenza,* 128 Md.App. 357, 362, 738 A.2d 312 (1999).

We shall therefore vacate the judgment at issue and remand for further proceedings at which the circuit court shall determine Kelly's right to parental support by applying the Child Support Guidelines.

(Footnotes omitted).

Upon remand, the circuit court entered an Order dated February 27, 2002, in which the court set appellee's monthly child support obligation at $634, through February 29, 2000.

Commencing as of March 1, 2000, the circuit court ordered McCarthy to pay child support of $702 per month. No appeal was taken from that Order.

A few months later, in June 2002, appellant filed yet another motion to modify child support, prompting appellee to seek termination of his child support obligation. The court held an evidentiary motions hearing in February 2003, at which Kelly, Corby, McCarthy, and Jeanne McCarthy testified. It is this hearing that is directly before us.

At the hearing, counsel for appellee stated: "[W]e're not contesting Kelly's disability." The court concluded that Kelly remains a destitute adult child who cannot meet all of her reasonable expenses. As we noted, however, pursuant to its Modification Order of February 24, 2003, the court reduced appellee's support obligation from $702 per month to $150 per month (i.e., $5 per day), effective as of August 1, 2002. We turn to review the evidence adduced at the hearing.

Kelly testified that she lives by herself but her mother pays her rent and all of her other bills. Kelly did not know the amount of her rent, and she said she had never written a check. Moreover, in answer to a series of questions, Kelly made clear that her mother helps her in countless ways with all of her daily tasks.

Ms. Corby testified: "Kelly has always been in special ed., and even prior to that, when she was born, she had obvious developmental disabilities with speech and language and neurological problems, and cognitive limitations. Her IQ is 61." According to appellant, Kelly also has "fine motor skills problems," including problems doing ordinary tasks such as brushing her hair.

As of the hearing, Kelly was employed by the VA as a GS-3 federal worker, earning a net monthly income of $1,337. While Kelly receives "automatic" pay raises, she had no merit increases in the four years that she had worked full time at the VA. Appellant added that, since the last hearing, Kelly "was cut off" from appellee's health insurance and will "have

to pick it up when open season comes." That cost would be an additional expense for Kelly.

Appellant's only income is her Social Security disability benefits of $540 per month.[3] Moreover, she claimed that, since the last hearing, her "health [had] deteriorated" because of the "extreme stress" she has experienced in caring for Kelly.

Of significance here, at the time of the hearing Kelly and appellant were no longer residing together. Instead, they had separate apartments in the same federally subsidized apartment building for "low income people." According to appellant, they are both "very, very small apartments." Appellant had a one bedroom apartment, for which she paid $122 per month in rent, while Kelly had a one bedroom unit with a den, costing $469 per month.[4]

Appellant testified that she and Kelly had previously lived together in a three-bedroom apartment, but when Kelly "got her Section 8 voucher," there were no available "three-bedroom tax credit apartments...." She claimed they had "no choice" but to take two separate apartments that were "close together...."

Although Kelly had her own apartment, appellant acknowledged that she continued to provide all of Kelly's care, including preparation of her meals, awakening her in the morning for work, buying her clothes and food, and paying her bills. Moreover, appellant managed Kelly's money through three bank accounts, which appellant referred to as "family money." Kelly's paycheck, appellee's child support payments, and ap-

---

**3.** Reading from a report, appellant testified that she receives disability benefits because she "suffer[s] from mental disorders, including major depression, anxiety, panic, and personality disorders, which are severe, as well as a affective disorders and obsessive-compulsive disorder. Depressive symptoms include sleep disturbances, appetite disturbance with weight loss, feeling overwhelmed...."

**4.** According to appellant, Kelly needed a second bedroom because she sometimes requires "overnight care" from a provider furnished by an agency.

pellant's Social Security benefits were all commingled in these accounts, from which appellant paid all of the expenses for both appellant and Kelly.

The extent of appellant's care for Kelly is reflected in the following testimony:

[APPELLANT'S ATTORNEY]: Ms. Corby, how does Kelly get home from the Metro?

[APPELLANT]: I pick her up, just like I picked her up yesterday. I pick her up every day. We go to the Giant. We grocery shop together, and then we come home, and I make dinner.

[APPELLANT'S ATTORNEY]: When you go grocery shopping, who pays for the groceries?

[APPELLANT]: I do.

[APPELLANT'S ATTORNEY]: Out of what account do you pay for the groceries?

[APPELLANT]: We have a joint account. I mean, I'm not going to put her in another line for her to pay what she wants. Most of them groceries are Kelly, what she likes, and I usually end up eating whatever I buy for Kelly.

[APPELLANT'S ATTORNEY]: Okay. So you buy the groceries for the two of you out of the joint account?

[APPELLANT]: Yes.

[APPELLANT'S ATTORNEY]: Would Kelly even know how to pay for groceries?

[APPELLANT]: No. She's never written a check, and I don't think she understands the concept of money, and she has problems with simple [a]rithmetic as well.

[APPELLANT'S ATTORNEY]: Okay.

Has she ever gone out with money and not brought back the proper change?

[APPELLANT]: Many times.

\* \* \*

[APPELLANT'S ATTORNEY]: When you have dinner, where do you have dinner at?

[APPELLANT]: I have dinner every night with Kelly, in Kelly's apartment.

[APPELLANT'S ATTORNEY]: Who cooks dinner?

[APPELLANT]: I make dinner.

[APPELLANT'S ATTORNEY]: Does Kelly ever cook dinner?

[APPELLANT]: Kelly has never used the stove or anything like that, nor has she ever made a sandwich, unfortunately.

[APPELLANT'S ATTORNEY]: What do you do in the morning with Kelly?

[APPELLANT]: In the morning, I wake [her] up every morning when she goes to work, and it's usually a struggle to get her to go to work .... and there's some days that she refuses to go. I mean, I can't fight her. I have tried to tell her that she may lose her job if she doesn't go.

But on the good days when she's agreeable to go to work, I wake her up. The night before I sort of decide what outfit she's going to wear. Kelly has a problem in terms of she has no concept of if it's winter or summer.

She would wear—if I didn't do that, she [would] wear something like a summer dress or something summery without a coat. So I select her clothes. So she comes down and—she puts on her clothes, comes down, then I put on her makeup, do her hair.

First, I wash her face, then I brush her teeth, then I put on her makeup, and make sure her hair looks nicely brushed, and she puts on her jacket.... I make sure that she has her medications, her keys, a $10 bill, her Metro card in her purse. Then she goes to work.

[APPELLANT'S ATTORNEY]: Now Kelly testified that she buys the Metro card. Does she buy the metro card?

[APPELLANT]: No. We usually get it in the Giant, so that's where we get it.

[APPELLANT'S ATTORNEY]: Who pays for that? How do you pay for that? Out of what account?

[APPELLANT]: From our joint account through NCT.

[APPELLANT'S ATTORNEY]: Do you ever give her any lunch money?

[APPELLANT]: Yes. I make sure that she has at least 10 to 15 dollars in her purse every day.

[APPELLANT'S ATTORNEY]: Okay. And where do you get that money?

[APPELLANT]: That's our family money that she has.

[APPELLANT'S ATTORNEY]: Is that from the joint account?

[APPELLANT]: The joint account.

[APPELLANT'S ATTORNEY]: Okay. Do you buy—does she go and buy her makeup or do you buy it?

[APPELLANT]: I buy everything. She wouldn't know what to buy.

[APPELLANT'S ATTORNEY]: Is there anything that she buys on her own?

[APPELLANT]: A soda, a candy bar.

[APPELLANT'S ATTORNEY]: Do you pay for any necessaries?

[APPELLANT]: I pay for everything.

[APPELLANT'S ATTORNEY]: And out of what account do you pay for it?

[APPELLANT]: Out of the family account.

[APPELLANT'S ATTORNEY]: Does her paycheck go in there?

[APPELLANT]: Yes.

With respect to Kelly's ability to function independently, the following testimony of appellant is noteworthy:

[APPELLANT'S ATTORNEY]: Do you believe that Kelly would be able to live on her own if it weren't for you?

[APPELLANT]: Kelly wouldn't be able to have dinner without me. As a matter of fact, I was in your office last week. I came home, because I was with you, and Kelly was hungry. She tried to make crackers and peanut butter, and

I came into the kitchen and the peanut butter was all over the place, and the crackers were open. So that was her attempt at making dinner for herself. So I don't think she could do a whole day.

[APPELLANT'S ATTORNEY]: Do you think that she would be able to live in an apartment building that's separate from yours?

[APPELLANT]: No.

\* \* \*

[APPELLANT'S ATTORNEY]: Do you consider her independent?

[APPELLANT]:—I see her as having her own bedroom, or really it's me having my own bedroom. We're together in her apartment, and then I can go to my bedroom and go to sleep and start again the next day.

Although appellant acknowledged that Kelly does not live entirely "on her own," appellant explained why she believes it is necessary for Kelly to reside in her own apartment. She explained: "I'm not going to live forever. I feel as though to give Kelly some type of feeling on independence.... [W]e're always together ... But I wanted [Kelly] to get some feeling of learning some daily living skills, independently, if I'm not around." Appellant added that, apart from herself, "Kelly has no one."

Kelly obtained her driver's license in 1998, but does not drive alone and cannot park the car by herself. Appellant switches seats with Kelly to park the car in the garage of their building.

Mr. McCarthy testified that he was almost 53 years old at the time of hearing. He stated that he earned $2,861.60 biweekly.

In an oral decision from the bench, the court determined that Kelly "does have [the] means of subsistence," despite her "mental infirmity." But, the question remained, said the court, as to "whether she can be self-supporting." The court

stated: "So the fact that she has some means of subsistence doesn't necessarily mean she can be self-supporting, but it doesn't necessarily mean she can't be self-supporting."

In analyzing whether Kelly has the capacity to be self-supporting, the court said it must "determine whether [Kelly's] income is sufficient to cover" her "reasonable expenses." Moreover, based on F.L. § 13–107,[5] the court said it was required to consider Kelly's "financial circumstances."

The court clearly wrestled with the notion of reasonable expenses for a developmentally disabled twenty-three year old woman. It said: "I am having a very difficult time dealing ... with the word, 'Reasonable expenses,' because while what is being spent isn't extravagant, it may not be reasonable under these circumstances." The court observed:

[T]his child ... is a real person, a human being, a person who her mother has testified knows she has infirmity but doesn't want it to be seen, or disclosed, or people to comment.

So she wants to look good when she goes out. She puts make-up on. She wants her hair done. She wants to be like other people, and her mother testified that she—her mother wants her to have her own independence, her own privacy as much as possible.

Nevertheless, the court determined that Kelly lacks the capacity to function independently. It said:

The problem is she is suffering from a mental infirmity, and she can't be independent, and without her mother, based on this evidence, this child, without her mother's attention to her and care for her, she would not be able to function in any degree yet her mother has arranged for this child to have her own home and an automobile, an automobile she can't even park, an automobile she can't drive

---

5. F.L. § 13–107(b) states: "In determining the amount of support [for a destitute adult child or destitute parent,] the court shall consider the financial circumstances of the individual."

unless her mother is in the car with her, yet her mother has her own car, and her mother has her own home.

Because the court determined that Kelly cannot function independently, it concluded that it was not appropriate for Kelly to live in her own apartment. The court said: "[Kelly] is with her mother all the other time, and I respect the fact that her mother has got her own life perhaps and that she wants to be alone, but that is not what this is all about."

Accordingly, the court expressly found it unreasonable for Kelly to live in her own apartment. The court explained:

They are inconsistent with each other, with all due respect. So on the one hand it is terrific that this child can go to work, make her way down on the subway to get to work, do the job that she is given to do, make her way back home, come into her apartment, see her mother there, and—but at the end of the day it seems to me, based on this testimony, that at the end of the day her mother goes back to her place, and Kelly stays in her place.

They turn the lights out and they go to sleep, but when . . . the next morning comes, her mother is in her apartment, in Kelly's apartment, wakes her up, gets her ready, feeds her, helps her get dressed, combs her hair, helps her brush her teeth, sends her on her way.

\* \* \*

Without her mother's involvement, she just could not function in that way. So my view is that what is reasonable isn't what her mother thinks the child should have but really what is reasonable to expect from an adult destitute child who has the ability to earn money but not spend it without somebody's assistance.

In analyzing Kelly's expenses, the court recognized that Kelly and her mother "live close to the edge. There is no frills [sic] in their lives . . . ." In the court's view, however, "many of the expenses claimed are duplications," because appellant and Kelly live in separate apartments. The court added: "[Kelly] has signed leases. She has got a telephone.

She is legally responsible for all of those affairs, but she has no practical way to fulfill her legal obligations."

The court was also convinced that Kelly "does not need an automobile. She may want to have one, but she doesn't need one. She can't, other than being alone at night when she is asleep, she isn't alone." It said:

[W]ith all due respect, this is not a two car family. I recognize that . . . it might be important or—for this child's self worth or her own dignity; however, it is also clear she doesn't have a clue about the world, and how it works, and money, and writing a check, and paying bills.

Characterizing Kelly as the "bread winner," the court seemed to imply that appellant benefits economically from Kelly's money. Troubled by the mother's use of a "family account" containing Kelly's money, the court asserted that appellant has no "legal relationship" to her daughter. Further, it said:

[T]his is a terrible way to say it, but the mother and this child have no actual legal relationship other than being mother/child.

She is not her guardian. She is not her legal custodian. The mother has absolutely no right that I know of—I know of no law that permits the mother to commingle this child's money with her own and then spend it even though she is spending it for items like food, and clothes, other sundries, there is no law that permits the mother to do that.

It is clear, while she testifies she isn't spending the child support—the direct child support Mr. McCarthy is paying, I mean, that is beside the point, the fact is the mother testified that they have a joint account.

She calls it a family account. She describes her and Kelly has [sic] a family and that they are, no one can quarrel with that, but the money has to be kept apart.

You can't just commingle it and use it like that.

* * *

So whatever monies that this child makes and puts into an account has to be accounted for. You cannot just continue to use the money the way it is being used, even though I am not saying it is used for extravagances, it isn't.

In regard to Kelly's expenses, the court noted that in 1998 Kelly had expenses of about $1,000 per month, which almost matched her net income at that time. The court determined that Kelly's current reasonable expenses amount to about $1,500 a month and, due to an increase in earnings, Kelly now has a gross monthly income of $1,902, from which she nets $1,337 per month. After computing Kelly's monthly expenses, the court subtracted that sum from her net monthly earnings of $1,337, and arrived at a monthly deficit for Kelly in regard to her expenses.

The court explained its calculations of Kelly's monthly expenses as follows:

I have considered her reasonable expenses to be $60.00 for a phone, $450.00 for food, $130.00 for a drugstore, $50.00 for supplies, $145.00 for tuition, cable and internet expense is an expense that would be shared with her mother. They live together—a video expense for $50.00.

They—her—what she spends to go on the Metro, a clothing expense of $100.00 a month, incidentals $58.00, and her hair $100.00 a month, so her expenses on a monthly basis are somewhere—I mean, I determine her reasonable expenses to be somewhere around $1400.00 a month for a child in her circumstances.

Noticeably absent from the court's determination of Kelly's expenses was any housing allowance.

Further, the court found that appellee's income has increased to between $6,200 and $6,500 a month. It also recognized that appellant is disabled and has almost no income.

With respect to calculating appellee's support obligation, the court reiterated that it is unreasonable for Kelly to live in her own apartment. It said:

> If I applied the strict guidelines to this case it would be either somewhere between $795.00 and $827.00 a month, depending upon the gross income attributed to Mr. McCarthy of either $6200.00 or something a little over $6500.00 with interest.

> \* \* \*

> I have looked at the financial statement submitted on behalf of Kelly, and it isn't clear from the record, but I know she has a two bedroom place, and her mother—excuse me—has a one bedroom place. Her mother even testified that the mother has taken most of her furniture, furnishings, clothing, cooking utensils, and so forth and put them in Kelly's place because that is where she—that is where she is when Kelly is around.

> I have got to deal with the reality, and the reality is, well, here I am saying you can't have two homes, you can't live in two different places. *There can only be one home.*

> \* \* \*

> They still have got a lease to pay and they don't have any money to pay it with. . . . *I am going to find that it is not reasonable for this child to have her own place because she needs her mother to be with her when she is home except when she is doing a puzzle, or except when she is watching a video, or—and she can do that in her own room in her mother's place.*

(Emphasis added).

Although the court recognized that the Guidelines apply to an adult destitute child, and that appellee's child support obligation under the Guidelines would amount to about $800 per month, the court reduced appellee's support obligation to

$150 per month.[6] In regard to its downward deviation from the Guidelines, the court said:

[I]t is in the best interest of this child to be able to accomplish as much in her life as she can possibly accomplish as a human being.

Her mother is doing the best the way she knows how to do that, and to—to one extent, she should be applauded for that ...

... She can do everything for her child that [she] is unable to do for herself, and I don't mean that in a disrespectful way, but the fact is this child is the bread winner in that family, she clearly is.

A ... destitute adult child is the primary person in that family who supplies income into the family, and that is a fragile existence for both the child and the mother, all of which I think is necessary to compartmentalize as it applies to the child support obligation of ... the other parent, if you will, and that is why I believe it is necessary to deviate from the guidelines because I believe it is reasonable for me to determine what are the reasonable expenses of this child, not what the actual expenses are but what are the reasonable expenses, and I have articulated them, and then when adding them up, it comes out pretty close to what the child's net income is ...

\* \* \*

I have determined that her reasonable expenses on a monthly basis are about $1500.00 a month. ... I have considered the guidelines and what they would be. I have determined that this order varies from the guidelines

I have put into the record the reasons why, and it is in the best interest of this child to receive the support that I have ordered because it is in her best interest to continue her lifestyle the way it is.

---

**6.** In its oral ruling, the court seemed to find implicitly that Kelly is an adult destitute child. But, in its Modification Order, the court expressly found that Kelly is an adult destitute child.

Certainly if she didn't work her father ... might have to pay more child support, but the fact is it is in her best interest to be self-supporting and have her own dignity, and she is.

The problem is she is also supporting some of her mother's expenses, and her mother is making decisions for her that are not reasonable under these circumstances, that is the car and having her own place and those related expenses.

So having said all that, I am going to order that child support be modified to the amount of $150.00 each month. Now that modification will take effect retroactive to when Mr. McCarthy filed his request for modification ... on July 10, 2002. So I will make this effective August 1, 2002 at the rate of $150.00 a month.

\* \* \*

So for the reasons that I have said ... it is not [Kelly's] fault, it is not her father's fault, it is not even her mother's fault. Her mother wants what is best for her. She is trying to make her get out there and be independent, but it is not reasonable under these circumstances.

After the court announced its ruling, appellant's counsel complained about "the denial of allowing Kelly any living expenses as far as her apartment because now she is going ... to have to move in with her mother ... therefore, the mother is going to have to get a two bedroom." Appellant's lawyer continued: "I think some of that cost should be attributed to Kelly instead of making it all attributed to the [mother], and some of the—some of the utilities." Therefore, the mother's attorney asked the court to reconsider the calculation of Kelly's expenses to take into account the cost to appellant of having to rent a two-bedroom apartment in order to house Kelly. The following colloquy ensued:

[THE COURT]: I don't agree—I don't disagree. I think it is—it is necessary under these circumstances if nothing else changes that *this child will be taken care of on a day-to-*

*day, minute-by-minute basis by her mother,* **and they have to live together,** and—

[APPELLANT'S ATTORNEY]: But what I am saying is that it appeared *when you did the calculations that you are not adding anything*—

[THE COURT]: *I don't know what to add.* I saw her mother's [apartment] is $122.00. Now, I know that is a one-bedroom—

[APPELLANT'S ATTORNEY]: Right.

[THE COURT]:—but I don't know if that is based on her income or not. There is no evidence of that. Her income is less, so maybe she pays less. Kelly's income is more, maybe she pays more.

If they both live together and the lease is under the mother's name, maybe it is less. I don't know what the figure would be, but it is a figure. There is going to be a different number, there is no doubt about that.

I hope you all can figure that out.

\* \* \*

[APPELLANT'S ATTORNEY]: ... [B]ut what I am saying is that we have already got an entry for a two-bedroom is 469. So if you are effectively forcing Bonnie to—and Kelly to live together, but then *you are saying, well, [appellant] has to incur the entire cost of a two-bedroom without any contribution from the father, there should be some kind of contribution—Kelly has to live somewhere,* and there should be some kind of contribution from him toward the apartment—

\* \* \*

[THE COURT]: The child's income should be apportioned to her reasonable expenses, and that shouldn't include any of her mother's expenses. If her mother makes from Social Security $540.00 a month that is the extent upon which her mother can rely.

She can't rely on any of Kelly's money to contribute to any of her expenses, she cannot.

[APPELLANT'S ATTORNEY]: I am not asking her to do that, what I am saying is that there is going to be a two-bedroom apartment that Kelly is going to be living in with her mother, and you are effectively—I mean, it is not like we are saying Kelly has to move in with Mr. McCarthy.

I mean, Kelly will be living there, and part of that apartment expense is—is technically apportioned to Kelly. I am not saying for him to pay anything towards Bonnie, but I just think when you are looking at Kelly's living expenses, I am just asking Your Honor to reconsider and consider putting in a portion for her actual living somewhere.

[THE COURT]: How much?

[APPELLANT'S ATTORNEY]: Half of the 469.

[THE COURT]: I don't know, but shouldn't it based on what it really is?

[APPELLANT'S ATTORNEY]: It is 469. She has a two-bedroom right now at the Grand, that is how much it is.

[THE COURT]: Ma'am, I don't know if it is going to be cut in half or not, maybe it will be less than that. Maybe it will be more than that because there is two people living there.

I—I don't want her to be put out on the street or have some other place to live, I want her to have ... a safe, comfortable place to live.

[APPELLANT'S ATTORNEY]: Would Your Honor take additional testimony on the amount of what it would be for a two bedroom because my client says it will be the same amount if they are living together.

[APPELLANT]: When we were living together, it was the same. We wouldn't be able to live at the Grand. We wouldn't be able to get a place together.

[THE COURT]: You know, I don't mean this disrespectful [sic], but you come in here like I am the only person who can deal with these problems. These are real problems in

these people's lives and this little baby who can't take care of himself.

This has to—I mean, shouldn't I have some evidence other than what your client tells me it is going to be?

[APPELLANT'S ATTORNEY]: Well, you have got the evidence of what a two bedroom is right now, 469.

[THE COURT]: Yes.

[APPELLANT'S ATTORNEY]: Even if you don't half it, there is still going to be some cost attributed to Kelly, even if it is not half of 469, even if it is a third of 469, there is still some cost that is attributable to Kelly.

[THE COURT]: Well, I don't know that the mother can't go to the child's place and sign the lease that the child's place is—and for less money. I don't know how that all works.

Somebody has to tell me how that works because it might be because of her disability she qualifies as the primary tenant that the child can live with. I mean, maybe that is how it works.

I don't want to foreclose that, but I just can't make a guess.... I just can't guess....

[THE COURT]:—and I am not going to.

[APPELLANT'S ATTORNEY]: It is just what you are then effectively saying is that her living expenses are zero to live in an apartment?

[THE COURT]: No. I am not saying that, I said it wasn't reasonable for her to have her own place.... I have ruled....

(Boldface and italics added).

### *DISCUSSION*

### I.

■ Appellant complains that appellee "seeks to relitigate exactly the same two points of law" that were resolved by this Court in *McCarthy I*. Relying on the doctrine of "law of the case" and principles of *res judicata* and collateral estoppel,

appellant urges this Court to uphold the conclusions announced in *McCarthy I*, in which this Court recognized that: 1) the support of a destitute adult child is "on equal footing" with the support of a minor child, and 2) the child support guidelines, F.L. § 12–202, apply in calculating support for an adult destitute children.

Appellee vigorously argues that the law of the case doctrine does not apply here, because the case *sub judice* does not involve "further proceedings in the same matter." To the contrary, appellee asserts that the litigation in *McCarthy I* "concluded when this Court vacated the prior decision" and, upon remand, there was no further appeal from the entry of a final judgment. He argues: "The law of the case doctrine does not apply to this appeal because the decision in *McCarthy I* was not rendered in the same case. The present appeal is based on a new factual record and is not simply a continuation of the prior matter."

Even if the law of the case doctrine applies generally, appellee contends that it is not a rigid concept. He asserts: "The doctrine [of law of the case] was not created to prevent an appellate court from reexamining a prior decision in another case when presented with a new record containing different facts." Claiming that *McCarthy I* erroneously concluded that the Guidelines apply to a case involving a destitute adult child, appellee also insists that this Court has "the power" to "disregard or correct its former decision...." *Kline v. Kline*, 93 Md.App. 696, 700, 614 A.2d 984 (1992). For these reasons, appellee urges us "to revisit" our unreported decision in *McCarthy I*, which "held that application of the child support guidelines is mandatory in determining the amount of child support to be awarded to a destitute adult child."

Preliminarily, we are satisfied that, in the context of this case, the child support modification proceedings at issue constituted a continuation of the previous child support proceedings. Although new evidence was necessarily presented at the modification hearing, we disagree with appellee's suggestion

that the case *sub judice* must be analyzed as if it were entirely distinct from *McCarthy I.* We explain.

In the circuit court, both parties sought to show a substantial change in circumstances as a basis to support their respective motions to modify the existing support order. Each relied on F.L. § 12–104. Under F.L. § 12–104(a), a court has discretion to modify a child support award, provided that there has been "a 'material' change in circumstances, needs, and pecuniary condition of the parties from the time the court last had an opportunity to consider the issue." *Kierein v. Kierein,* 115 Md.App. 448, 456, 693 A.2d 1157 (1997) (citation omitted); *see Wills v. Jones,* 340 Md. 480, 489, 667 A.2d 331 (1995); *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986); *Petitto v. Petitto,* 147 Md.App. 280, 306, 808 A.2d 809 (2002).

The burden of proving a material change in circumstance is on the person seeking the modification. *See Haught v. Grieashamer,* 64 Md.App. 605, 611, 497 A.2d 1182 (1985). A change is "material" when it meets two requirements. First, it must be "relevant to the level of support a child is actually receiving or entitled to receive." *Wills,* 340 Md. at 488, 667 A.2d 331. Second, the change must be "of a sufficient magnitude to justify judicial modification of the support order." *Id.* at 489, 667 A.2d 331 (citation omitted); *see Wagner v. Wagner,* 109 Md.App. 1, 43, 674 A.2d 1, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996). Thus, the court must focus upon "the alleged changes in *income or support*" that occurred after the child support award was issued. *Wills,* 340 Md. at 489, 667 A.2d 331 (emphasis added). *Wills* makes clear that "the passage of some event causing the level of support a child actually receives to diminish or increase" is relevant and material. *Id.* at 488 n. 1, 667 A.2d 331. A change "that affects the income pool used to calculate the support obligations upon which a child support award was based" is also relevant. *Id.*

Therefore, to meet the criteria for modification, the court below had to consider the circumstances that were in effect when the challenged support order was issued, as well as any

new evidence on which the parties relied to justify the modification. In the context of a child support modification proceeding, however, such new evidence does not transform the matter into an entirely new case. *See* F.L. § 12–202 (providing that the Guidelines apply in child support modification proceedings); *Drummond v. Drummond,* 350 Md. 502, 508, 714 A.2d 163 (1998); *Smith v. Freeman,* 149 Md.App. 1, 21, 814 A.2d 65 (2002); *Dunlap v. Fiorenza,* 128 Md.App. 357, 363, 738 A.2d 312 (1999), *cert. denied,* 357 Md. 191, 742 A.2d 520 (1999).

It is also noteworthy that the parties did not file a new case in seeking modification. Rather, their modification motions were filed in an existing case, Equity Case No. 72150, which was opened in 1980 when the divorce litigation commenced. And, as we noted, the trial court's ruling, which is at issue on appeal, is captioned "Modification Order." If that order did not pertain to the continuation of an existing matter, there would have been nothing for the court to "modify." In this light, the current battle is a continuation of the parties' ongoing war concerning child support. To conclude otherwise is to ignore the elements of a child support *modification* proceeding.

 Because the modification proceeding was a continuation of prior litigation between the parties with respect to child support for Kelly, we next consider the parties' conflicting claims regarding the law of the case doctrine. In Maryland, "once a decision is established as the controlling legal rule of decision between the same parties in the same case it continues to be the law of the case." *Kline v. Kline,* 93 Md.App. at 700, 614 A.2d 984; *see Hagez v. State,* 131 Md. App. 402, 418, 749 A.2d 206 (2000); *People's Counsel v. Prosser Co.,* 119 Md.App. 150, 176, 704 A.2d 483, *cert. denied,* 349 Md. 494, 709 A.2d 139 (1998). In general, the law of the case doctrine "prevents trial courts from dismissing appellate judgment and relitigating matters already resolved by the appellate court." *Stokes v. American Airlines, Inc.,* 142 Md. App. 440, 446, 790 A.2d 699 (2002), *cert. denied,* 369 Md. 179,

798 A.2d 552 (2002). The doctrine also applies when we revisit a prior decision of this Court involving the same parties and the same claim. *Id.; see also Turner v. Housing Authority,* 364 Md. 24, 31–32, 770 A.2d 671 (2001); *Korotki v. Springer,* 218 Md. 191, 193–194, 145 A.2d 767 (1958); *Hawes v. Liberty Homes, Inc.,* 100 Md.App. 222, 230, 640 A.2d 743 (1994). Therefore, when an appellate court "answered a question of law in a given case, the issue is [usually] settled for all future proceedings." *Stokes,* 142 Md.App. at 446, 790 A.2d 699.

▮ Nevertheless, as appellee correctly observes, the doctrine is not "an inflexible rule of law." *Stokes,* 142 Md.App. at 446, 790 A.2d 699. Rather, "it is a judicial creation . . . ." *Id.* The Court of Appeals explained in *Goldstein & Baron Chtd. v. Chesley,* 375 Md. 244, 253, 825 A.2d 985 (2003):

> [T]he "law of the case" doctrine is one of appellate procedure and convenience rather than an inflexible rule of law, such as claim or issue preclusion, and . . . although an appellate decision certainly binds lower courts, the appellate court that rendered the decision is not precluded from reconsidering an issue it previously decided, even in the same case, when exceptional circumstances so warrant. The thrust of *Hawes* [*v. Liberty Homes,* 100 Md.App. 222, 640 A.2d 743, *cert. denied,* 336 Md. 300, 648 A.2d 203 (1994) ] was that decisions rendered by a prior appellate panel of the Court of Special Appeals will generally govern in a second appeal "unless (1) the previous decision is patently inconsistent with controlling principles announced by a higher court and is therefore clearly incorrect, *and* (2) following the previous decision would create manifest injustice."

The Court of Appeals has carved out three exceptions to the general rule regarding law of the case, stating that an appellate court will depart from a prior decision when " 'the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision on the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.' " *Turner,* 364

Md. at 34, 770 A.2d 671 (quotation omitted); *see Scott v. State*, 150 Md.App. 468, 475–76, 822 A.2d 472 (2003); *Stokes*, 142 Md.App. at 447, 790 A.2d 699.

"The law of the case doctrine lies somewhere beyond *stare decisis* and short of *res judicata." Tu v. State*, 336 Md. 406, 416, 648 A.2d 993 (1994). *Stare decisis* is intended "to insure that people are guided in their personal and business dealings by prior court decisions, through the established and fixed principles they announce ..." *Plein v. Department of Labor, Licensing and Regulation*, 369 Md. 421, 435, 800 A.2d 757 (2002). The related doctrine of *res judicata* "is intended to prevent multiplicity of litigation and to avoid the vexation, costs and expenses incident to more than one suit on the same cause of action." *Carlin v. Fischer*, 212 Md. 526, 533, 129 A.2d 827 (1957). The Court elucidated the relationship between *stare decisis, res judicata*, and law of the case in *Tu*, 336 Md. at 416, 648 A.2d 993:

> "The law of the case, like stare decisis, deals with the circumstances that permit reconsideration of issues of law. The difference is that while stare decisis is concerned with the effect of a final judgment as establishing a legal principle that is binding as a precedent in other pending and future cases, the law of the case doctrine is concerned with the extent to which the law applied in decisions at various stages of the same litigation becomes the governing principle in later stages.... As applied to appellate court decisions, it serves the dual function of enforcing the mandate and precluding multiple appeals to review the same error. Like stare decisis, the doctrine of the law of the case is quite rigidly applied to force obedience of an inferior court, but more flexibly in its application to reconsideration by the court that made the earlier decision."

(quoting 1B J.W. Moore, J.D. Lucas & T.s. Currier, MOORE'S FEDERAL PRACTICE, ¶ 0.401 at I–2 to I–3 (2d ed.1993) (footnote omitted)).

The important issue of whether the Guidelines apply in calculating support for a destitute adult child is a question of

law, which was certainly resolved as to these parties and their child in *McCarthy I* for purposes of law of the case. Because *McCarthy I* was not a published opinion, however, it did not establish a legal principle concerning application of the Guidelines that is binding in other cases as judicial precedent. Maryland Rule 8–114 provides that an unreported decision "is neither precedent within the rule of stare decisis nor persuasive authority." Consequently, it "may be cited only (1) when relevant under the doctrine of the law of the case, res judicata, or collateral estoppel, . . . ." *Id.* *See Piper v. Layman,* 125 Md.App. 745, 751, 726 A.2d 887 (1999). In light of the importance of the issue regarding the application of the Guidelines in a case involving a destitute adult child, and because *McCarthy I* was limited to the parties to this case, we shall consider the issue again, *infra.*

In contrast to the issue regarding the application of the Guidelines in calculating support for a destitute adult child, the determination in *McCarthy I,* upholding the finding that Kelly is an adult destitute child, was predicated on the application of law to specific factual findings. Those findings are subject to change. Put another way, even if the parties agree that Kelly suffers from a serious mental infirmity, the conclusion that Kelly is a destitute adult child must be based on a finding that she now lacks the ability to be self-supporting. That conclusion, in turn, depends upon current evidence relating to Kelly's earnings and expenses.

Accordingly, the law of the case doctrine does not necessarily preclude our reconsideration of Kelly's status as a destitute adult child. However, as the party seeking to terminate support, appellee had the burden to demonstrate that Kelly is self-supporting, despite her developmental disability. We shall next consider that issue.

## II.

Appellee challenges the trial court's finding that Kelly is a destitute adult child under F.L. § 13–101(b). While conceding that Kelly has substantial limitations, appellee

maintains that she is not a destitute adult child because the evidence demonstrated that she has sufficient means to support herself, notwithstanding her disability.

In his brief, appellee writes:

Kelly has no understanding of her financial affairs. She does not know her own salary; her mother pays all of her bills; Kelly does not know how much her rent is; she does not know if her apartment has a utility bill; Kelly has never written a check, made a bank deposit or used a bank machine.

Kelly is completely dependent on her mother for all of her daily needs. Her mother picks out her clothes and puts on her make-up. Kelly cannot comb her hair, shave her legs or brush her teeth without her mother's help. Kelly does not make her own meals or go grocery shopping by herself. She cannot cook for herself. When Kelly goes clothes shopping she never goes by herself. Without her mother's assistance, Kelly would not be able to get up, get dressed, wash or go to work.

According to appellee, "for there to be a finding that an adult child is a 'destitute adult child,' the child's inability to be self-supporting must be *due to* [the child's] mental or physical infirmity." He claims that "[t]here is no evidence in this case to support a finding either (a) that Kelly's income level is restricted by her disability, or (b) that her expenses are related to her disability." Appellee adds: "A parent . . . has no duty to support an adult child merely because the child has insufficient funds for self-support unless the reason that the child cannot be self-supporting is 'due to mental or physical infirmity.'" In his view, the "evidence in this case does not show any connection between Kelly's disabilities and her alleged inability to meet her monthly needs; therefore, the trial court's finding that Kelly is a 'destitute adult child' is clearly erroneous."

Parents have a common law and statutory duty to support their minor children. *See Middleton v. Middleton,* 329 Md. 627, 633, 620 A.2d 1363 (1993); *Sczudlo v. Berry,* 129

Md.App. 529, 542, 743 A.2d 268 (1999); *Goldberger v. Goldberger*, 96 Md.App. 313, 323, 624 A.2d 1328, *cert. denied*, 332 Md. 453, 632 A.2d 150 (1993); *see also* Title 12 of the Family Law Article. But, a parent has no common law duty to support an adult destitute child. *See Smith v. Smith*, 227 Md. 355, 359, 176 A.2d 862 (1962); *Borchert v. Borchert*, 185 Md. 586, 45 A.2d 463 (1946). Rather, that duty is a statutory creation.

In *Borchert*, 185 Md. at 590, 45 A.2d 463, the Court of Appeals announced that a parent has no obligation under common law to support an adult child who is physically or mentally disabled. That decision prompted the General Assembly to enact a law in 1947, then codified in Section 97 of Article 27, Md. Ann.Code, which made it a criminal offense for a parent of means to fail to support a destitute adult child. In *Smith v. Smith, supra*, 227 Md. at 360, 176 A.2d 862, the Court relied on that statute to uphold a trial court's order requiring the father of a disabled adult child to pay weekly child support to the child's mother.

A parent's statutory duty to support an adult child is triggered by a finding that the child is a destitute adult child within the meaning of F.L. § 13–101(b). That provision defines a destitute adult child as "an adult child who: (1) has no means of subsistence and (2) cannot be self-supporting, due to mental or physical infirmity." *Goshorn v. Goshorn*, 154 Md. App. 194, 217, 838 A.2d 1247 (2003); *see Sininger v. Sininger*, 300 Md. 604, 615, 479 A.2d 1354 (1984) (discussing Art. 27, § 97, the predecessor to F.L. §§ 13–101 and 13–102, and finding a parental duty to support an adult destitute child even if the disability occurred after the child reached the age of majority); *Freeburger v. Bichell*, 135 Md.App. 680, 686, 763 A.2d 1226 (2000); *Presley v. Presley*, 65 Md.App. 265, 276, 500 A.2d 322 (1985).

Even if the adult child meets the criteria set forth in the statute, however, the duty of a parent to support such a child does not arise unless "the parent has or is able to earn sufficient means" to provide support. F.L. § 13–102(b); *see Freeburger*, 135 Md.App. at 691, 763 A.2d 1226; *Presley*, 65

Md.App. at 276–77, 500 A.2d 322. If the parent has sufficient means to provide support, F.L. § 13–102(b) makes it a misdemeanor for that parent "to neglect or refuse to provide ... food, shelter, care, and clothing" to the adult destitute child.

"[T]he primary purpose of F.L. § 13–102(b) is ... to remove from public support destitute and disabled people whose relatives are financially able to support them." *Freeburger*, 135 Md.App. at 692, 763 A.2d 1226. In determining the amount of support, F.L. § 13–107(b) requires the court to "consider the financial circumstances of the individual."

In this case, there is no contention that appellee lacks sufficient means to support Kelly. There is also no dispute that Kelly has a serious mental infirmity. Instead, the issue concerns Kelly's capacity to be self-supporting.

As appellant observes: "Every judicial officer that has been involved in this case since 1998 has found that Kelly is an Adult Destitute Child." Indeed, as recently as August 2001, in *McCarthy I*, this Court upheld the circuit court's finding that Kelly was an adult destitute child, even though she was earning $16,000 per year at the time of the master's hearing in 1999. Since then, Kelly's annual employment income has increased to about $22,000 per year. But, her expenses have also increased. For example, after the last hearing, Kelly moved into her own apartment; she no longer receives Social Security benefits; and she must pay her own health benefits.

The court below concluded that, despite Kelly's increased income, she is not self-supporting, because her net income is less than her reasonable expenses. We undertake the review of that decision based on a clearly erroneous standard. Md. Rule 8–131(c); *Helinski v. Harford Mem. Hosp., Inc.*, 376 Md. 606, 614, 831 A.2d 40 (2003); *Roper v. Camuso*, 376 Md. 240, 260, 829 A.2d 589 (2003); *Fuge v. Fuge*, 146 Md.App. 142, 180, 806 A.2d 716 (2002), *cert. denied*, 372 Md. 430, 813 A.2d 258 (2002). In our view, the trial court was not clearly erroneous in finding that Kelly remains a destitute adult child.

*Presley v. Presley, supra,* 65 Md.App. 265, 500 A.2d 322, is instructive because of its factual similarities to this case. There, the Court considered whether the circuit court erred in requiring the father of Pamela, a "mildly mentally retarded" woman with an IQ of 77, to make periodic support payments.

Pamela required considerable help from her mother with daily activities, such as shopping and budgeting. Yet, the mother had allowed Pamela to "take an apartment of her own" and "to have her own car." *Id.* at 270, 500 A.2d 322. Despite her handicap, Pamela was also "capable of gainful employment." *Id.* at 271, 500 A.2d 322. In 1985, she earned a gross annual salary of $14,200, although her salary was not adequate to meet all of her living expenses; she had a deficit of approximately $200 per month. *Id.* at 271, 500 A.2d 322. Nevertheless, the father discontinued support payments when Pamela turned nineteen, because he "objected" to Pamela living in her own apartment or having her own car, claiming "her standard of living was too high." *Id.* at 270, 272, 500 A.2d 322.

The trial court found that Pamela "substantially supports herself," *id.* at 272, 500 A.2d 322, but was concerned about the permanency of Pamela's job. *Id.* Yet, because the court anticipated that Pamela would "be on her own," the court did not want to "assign[] to her a standard of living that she is not going to be able to maintain." *Id.* To "bridg[e] this gap," *id.* at 273, 500 A.2d 322, the trial court ordered the father to pay $100 per month in child support, stating, *id.:*

"We have to be pragmatic in these things. These are sad things, but there is no obligation that a parent maintain a child indefin[i]tely in an artificial standard of living. *Any child earning fourteen thousand dollars a year can maintain a decent standard of living without assistance. And I think it is manifestly unfair to require a parent to maintain a child in a standard of living in excess of that indefinitely."* (Emphasis in original).

The trial court also set the matter in for a review. The court explained that "if [Pamela] goes off probationary status,

the Court foresees an end" to the father's support obligation. *Id.* (italics deleted).

Writing for this Court, Judge Wilner observed, *id.* at 272, 500 A.2d 322:

> Pamela is not quite so independent as her living and working arrangements facially might suggest. Appellee [the mother] furnished her apartment and bought her a car; she has paid for Pamela's unreimbursed medical expenses and has made up part of Pamela's general monthly deficit. She has also provided substantial assistance to Pamela in terms of everyday activities—shopping, budgeting, attending to her clothes, etc.

> Most of this evidence was not really in dispute. Appellant's position was not that Pamela didn't have these expenses, but that they were unnecessary. He objected to Pamela's having her own apartment and car, and in general thought her standard of living was too high.

In analyzing the trial court's order, Judge Wilner explored the statutory definition of a destitute adult child and the parental duty of support for an adult child who has an infirmity and cannot be self-supporting. The Court made clear that "if appellant and Pamela meet the criteria" of F.L. § 13–101 and § 13–102, then "appellant can be made to provide support...." *Id.* at 276, 500 A.2d 322.

Significantly, while the Court emphasized that the duty of support extends only to reasonable expenses, it also made clear that a disabled adult child need not be unable to work entirely in order to qualify for support. The Court said, *id.* at 277–78, 500 A.2d 322:

> The first element [of F.L. § 13–101(b) ] is susceptible of three interpretations. One could read the language literally to require that the child be utterly penniless and unable to work—a hopeless charity case. We do not believe that the Legislature intended the language to be read so harshly, however; nor have the cases so read it. *See Sininger v. Sininger, supra,* 300 Md. 604, 479 A.2d 1354; *Stern v. Stern, supra,* 58 Md.App. 280, 473 A.2d 56. A second

approach, toward the other end of the spectrum, is to find a duty of support (against a sufficiently affluent parent) whenever the child's wealth or earning capacity is insufficient to defray his expenses, no matter how extravagant those expenses might be. We also reject that approach; it is inconsistent with the very concept of a "destitute adult child" and can hardly have represented the legislative intent.

The most reasonable construction, we think, lies between those extremes. The child need not be penniless, nor may he be profligate. The duty of support arises when the child has insufficient resources and, because of mental or physical infirmity, insufficient income capacity to enable him to meet his *reasonable* living expenses. This is a familiar standard which can be easily applied and readily reviewed. The court can examine the child's available assets, his eligibility for disability or other assistance, and his earning capacity and weigh them against what he reasonably needs to provide a proper subsistence level.

The *Presley* Court concluded that the trial judge had articulated the proper standard to analyze support, but "erred in applying the standard." *Id.* at 278, 500 A.2d 322. The Court observed that the duty of support did not depend on whether Pamela was a "tenured or probationary" employee, *id.*, as that "had no effect on her current level of expenses or her ability to meet those expenses through her own resources." *Id.* at 278–79, 500 A.2d 322. Because the trial judge failed to consider Pamela's "total expenses in light of her resources," *id.* at 279, 500 A.2d 322, the Court remanded the case, without affirming or reversing, and directed the court to "weigh Pamela's total reasonable living expenses against her existing available resources. If it finds a net deficit—a need for parental support—it may then order such support." *Id.* at 279, 500 A.2d 322. We continued: "That support can be ordered in the form of periodic cash payments, provision of insurance, payment of unreimbursed expenses, or some combination . . . ." *Id.*

Based on the rationale of *Presley*, we are satisfied that the trial court was not clearly erroneous in finding that Kelly is an adult destitute child. After cautiously calculating Kelly's expenses and her income, the court below found a deficit. Although Kelly has some "means of subsistence," the court was satisfied that Kelly is not self-supporting because she is unable to pay all of her reasonable expenses.

If this Court in 1985 did not consider that the adult child's earnings of $14,000 automatically precluded a finding that the adult child was destitute, then we are hard pressed to conclude in December 2003, 18 years later, that Kelly's earnings of $22,000 compel a finding that she cannot qualify as a destitute adult child within the meaning of F.L. § 13–101.

### III.

Appellee contends that the Guidelines do not apply to an adult destitute child. He asserts that the proper amount for the court to award is the difference between the destitute adult child's "total reasonable living expenses [and] her existing available resources." The father asserts:

> The enactment of the [child support] guidelines . . . represented a significant departure from the manner in which the amount of child support for minor children had been determined by Maryland courts prior to 1989. The issue for this Court to determine in the present appeal is whether the General Assembly intended for that departure to apply to determinations of child support for destitute adult children. The duty of a parent to support a destitute adult child developed legislatively along a parallel track with the duty of an adult child to support a destitute parent. The child support guidelines . . . do not apply in the latter instance.

Appellee points out that Art. 27, § 97 ("Failure of parent to support destitute adult child") was modeled by the legislature after Art. 27, § 104 ("Failure of children to support destitute parents"). The Court observed in *Sininger v. Sininger, supra,* 300 Md. at 612, 479 A.2d 1354, that "the General Assembly essentially tracked the then existing 'Destitute Parents'

subtitle when it responded to *Borchert* with the 'Destitute Children' subtitle...." *See Freeburger v. Bichell, supra,* 135 Md.App. at 692, 763 A.2d 1226 ("As we see it, the primary purpose of F.L. § 13–102(b) is the same as the primary purpose of F.L. § 13–102(a) as recognized by this Court in *Blucher* [*v. Ekstrom,* 68 Md.App. 459, 513 A.2d 923 (1986), *vacated on other grounds,* 309 Md. 458, 524 A.2d 1235 (1987) ]: to remove from public support destitute and disabled people whose relatives are financially able to support them." (Citations omitted)).

According to appellee, it is significant that the legislature modeled the parental obligation to support a destitute adult child on the statute requiring parental support. Based on the notion of a "parallel track," appellee asserts that the Guidelines "obviously" are inapplicable in regard to support for an adult destitute child, just as they are inapplicable to the duty of an adult child to support a destitute parent. He states:

When the Maryland legislature enacted the destitute adult child statute, it decided to mirror the new law after the then existing destitute parent statute rather than after the then existing laws which imposed a duty on parents to support their minor children. The General Assembly could have included destitute adult children within the statutory protections for minor children. From the Legislature's failure to do so can be inferred a legislative intent to treat the support obligation of parents for destitute adult children as analogous to the support obligation of children for destitute parents rather than to the support obligation of parents for their minor children.

Even if the origin of mandated support for adult destitute children developed along a parallel track with support for destitute parents, this does not establish that the General Assembly meant to preclude use of the Guidelines in cases involving adult destitute children. *Stern v. Stern, supra,* 58 Md.App. 280, 473 A.2d 56, on which this Court relied in both *Goshorn* and *McCarthy I,* is noteworthy.

In *Stern,* the Court discussed Md.Code, Art. 27, § 97, and said, *id.* at 294, 473 A.2d 56: "This particular statute was construed in *Smith v. Smith,* 227 Md. 355, 360, 176 A.2d 862 (1962), to be a clear indication of the intent of the legislature to place failure to support an incapacitated [adult] child on equal footing with failure to support a minor child." The *Stern* Court continued: "Since the Court of Appeals has held that the legislature intended 'to place the failure to support an incapacitated child on equal footing with failure to support a minor child,' it follows that the procedure and remedies for the enforcement of that right must also be 'on equal footing.'" *Id.* at 295, 473 A.2d 56. The "procedure", it seems to us, necessarily includes the use of the Guidelines.

In *McCarthy I,* appellee advanced the same position that he urges here. Rejecting appellee's position in *McCarthy I,* Chief Judge Murphy wrote for the panel:

We are persuaded that the Child Support Guidelines are as applicable to a "destitute adult child" as they are to a minor child. Any other interpretation would be inconsistent with the well established requirement that "the procedure and remedies for the enforcement of [an incapacitated adult child's] right [to parental support] must ... be 'on equal footing' [with a minor child's right to parental support."

*McCarthy I,* slip op. at 9–10 (quoting *Stern,* 58 Md.App. at 295, 473 A.2d 56).

Moreover, just recently, in *Goshorn v. Goshorn, supra,* this Court expressly held that the "guidelines are applicable to destitute adult children...." *Id.,* at 219, 838 A.2d 1247. That conclusion, announced in a published opinion, resolves this matter.

To be sure, the General Assembly has not expressly stated that the Guidelines apply to cases involving adult destitute children. But neither has it said that they do not apply. F.L. § 12–202(a)(1) states: "Subject to the provisions of paragraph (2) of this subsection, in any proceeding to establish or modify *child* support, whether pendente lite or permanent, the court shall use the child support guidelines set forth in this subtitle."

(Emphasis added). In our view, if the legislature meant to limit use of the Guidelines to *minor* children, or to bar the use of the Guidelines in a case involving a destitute *adult child*, it would have said so.

Title 10 of the Family Law Article is captioned "Support In General." In Subtitle 3 of Title 10, which pertains to the Maryland Uniform Interstate Family Support Act, F.L. § 10–301(b) defines "child" as "an individual, *whether over or under the age of majority*, who is or is alleged to be owed a duty of support by the individual's parent...." (Emphasis added). That definition suggests to us that the legislature was well aware of the difference between minor and adult children. Yet, nowhere in Title 12 does the statute restrict the application of the Guidelines to minor children.

■■■■■ The principles of statutory construction are relevant to our analysis. "The interpretation of a statute is a judicial function." *Rouse–Fairwood Development Limited Partnership v. Supervisor of Assessments*, 138 Md.App. 589, 619, 773 A.2d 535 (2001). A " 'cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State*, 352 Md. 400, 417, 722 A.2d 887 (1999)(quoting *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995)); *see State v. Green*, 367 Md. 61, 81, 785 A.2d 1275 (2001); *Webster v. State*, 359 Md. 465, 479, 754 A.2d 1004 (2000); *Board of License Comm'rs. v. Toye*, 354 Md. 116, 122, 729 A.2d 407 (1999). " 'The primary source of legislative intent is ... the language of the statute itself.' " *State v. Pagano*, 341 Md. 129, 133, 669 A.2d 1339 (1996) (citation omitted); *see Adamson v. Correctional Med. Servs.*, 359 Md. 238, 251, 753 A.2d 501 (2000); *Huffman v. State*, 356 Md. 622, 628, 741 A.2d 1088 (1999).

■■■■■ Generally, we "will not ... divine a legislative intention contrary to the plain language of a statute or judicially insert language to impose exceptions, limitations or restrictions not set forth by the legislature." *Langston v. Langston*, 366 Md. 490, 515, 784 A.2d 1086 (2001). Similarly, "[w]e neither add nor delete words to a clear and unambigu-

ous statute to give it a meaning not reflected by the words the Legislature used or engage in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. NationsBank,* 365 Md. 166, 181, 776 A.2d 645 (2001); *see Mid–Atlantic Power Supply Assoc. v. Public Service Comm'n of Md.,* 361 Md. 196, 204, 760 A.2d 1087 (2000) (recognizing that "we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in a forced or subtle interpretation in an attempt to extend or limit the statute's meaning").

Ordinarily, "if the plain meaning of the statutory language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end." *Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001). So long as "the language [of a statute] is clear and unambiguous, there is usually no need to look further." *Gary v. State,* 341 Md. 513, 521, 671 A.2d 495 (1996). On the other hand, the plain meaning rule is "elastic, rather than cast in stone[,]" and if "persuasive evidence exists outside the plain text of the statute, [pertaining to the meaning of a provision,] we do not turn a blind eye to it." *Adamson,* 359 Md. at 251, 753 A.2d 501. Rather, "in determining a statute's meaning, courts may consider the context in which a statute appears, including related statutes and legislative history." *Ridge Heating, Air Conditioning & Plumbing v. Brennen,* 366 Md. 336, 350–51, 783 A.2d 691 (2001). "We may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore v. Dep't of Employment and Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). "This enables us to put the statute in controversy in its proper context and thereby avoid unreasonable or illogical results that defy common sense." *Adamson,* 359 Md. at 252, 753 A.2d 501.

In addition, we may also consider " 'the consequences resulting from one meaning rather than another, and adopt

that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc. v. Anne Arundel County Board of Educ.*, 358 Md. 129, 135, 747 A.2d 625 (2000) (citation omitted); *see Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1 (1995).

Looking at the statutory scheme as a whole, in light of the well honed principles of statutory construction, we are satisfied that the Guidelines apply to the establishment or modification of child support for an adult destitute child as well as a minor child. Indeed, strict adherence to appellee's position could result in the subordination of Kelly's best interest in favor of appellee's desire, for economic reasons, to limit his support obligation. That position would conflict with the public policy considerations that culminated in the enactment of F.L. § 12–202 and F.L. § 13–102. *Cf. Shrivastava v. Mates*, 93 Md.App. 320, 330–335, 612 A.2d 313 (1992) (recognizing the paramount importance of the child's best interests and the importance of the guidelines as a matter of public policy, even when the parents had an agreement as to child support).

Several other states have addressed the question of whether their child support guidelines apply to adult destitute children in the absence of clear language in the applicable statute or rule. In *Ex Parte Cohen*, 763 So.2d 253, 256 (Ala.1999), for example, the applicable statute stated: "Guidelines for child support are hereby established for use in any action to establish or modify child support, whether temporary or permanent." Because the text referred to "any action," the Alabama court held that the provision encompassed all actions for child support, not merely actions concerning minor children. *Id.*

Similarly, in *DeMo v. DeMo*, 679 So.2d 265, 266–67 (Ala.Civ. App.1996), the Alabama Court of Civil Appeals construed the child support guidelines established by a rule promulgated by that state's highest court. The rule did not specifically provide that the guidelines apply to adult destitute children. Instead, it referred only to "child support." The Alabama court concluded that the words "child" and "children" in the

guidelines include dependent adult children. It reasoned that the state's highest court "could have precluded the application of the guidelines to adult disabled children by specifying that the guidelines are applicable only to 'minor' children." *Id.* at 267. Because there was no such "limitation" in the rule, the court reasoned that "it is logical to conclude that no limitation was intended." *Id.*

The Court of Appeals of California addressed the issue in *In re: Marriage of Drake*, 53 Cal.App.4th 1139, 1156, 62 Cal. Reptr.2d 466 (1997), *review denied*, 1997 Cal. LEXIS 3395 (Cal.1997). It noted that the legislature had not distinguished between minor children and adult disabled children in regard to the child support guidelines, which indicated to that court that the legislature intended the guidelines to "encompass" incapacitated adult children. *Id.* at 1155–1157.

In reaching its conclusion, the court observed that, with one exception, the legislature had used the term "child" rather than "minor child" throughout the pertinent provisions. On the other hand, the California legislature had enacted two separate but related provisions regarding the duty of parental support, one of which concerned a minor child and the other of which concerned an incapacitated adult child. The court said:

> We therefore infer that "the Legislature was fully aware of the need to differentiate between 'minor' children or 'adult' children ... where it intended to limit applicability of a particular provision to minor children on the one hand or adult children on the other," and we conclude that the Legislature's use of the unqualified word "child" here "must be deemed to have been a conscious, deliberate choice intended to refer to *any* child owed a duty of support by a parent."

*Id.* at 1156–57 (citation omitted).

*See also In re Marriage of Cropper*, 895 P.2d 1158, 1160 (Colo.Ct.App.1995)(finding application of the child support guidelines appropriate because the parties' 24–year old daughter was mentally retarded and required continued parental assistance); *Crawford v. Crawford*, 429 Pa.Super. 540, 633

A.2d 155, 160, 163 (1993) (stating that "parental support is required where a child has a physical or mental condition which exists at the time child reaches majority and prevents the [adult] child from being self-supporting or emancipated," and concluding that "a court has discretion to enter a support award that is outside the guidelines after considering the unique needs of the parties."); *Peterson v. Smith*, 307 S.C. 418, 415 S.E.2d 431, 433 (Ct.App.1992) ("[W]e find no logical reason why the guidelines should not apply to such a disabled [adult] child."); *In re M.W.T.*, 12 S.W.3d 598, 602 (Tex.App. 2000)(The child support obligation continues pursuant to the guidelines if a child's infirmity is known before he reaches the age of majority); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex.1990) (concluding that trial court did not err in utilizing child support guidelines for support of disabled adult child). *But see Davis v. Davis*, 79 Ark.App. 178, 84 S.W.3d 447, 452 (2002)(providing that when a child is mentally or physically disabled, the court may order a continuation of child support as if the child were still under the age of majority; analyzing parents' income in light of guidelines; and concluding that amount of child support award lies within court's sound discretion); *Sanders v. Sanders*, 902 P.2d 310, 314 (Alaska 1995)(noting that in a case in which an adult child is incapable of supporting himself due to emotional problems, the duty to provide child support continues as if the child had never reached the age of majority but guidelines do not apply); *Streb v. Streb*, 774 P.2d 798, 801 (Alaska 1989) (recognizing parental duty to support adult disabled child but concluding that child support guidelines are inapplicable, and stating that "award should be reasonably calculated to reimburse the moving party for a fair percentage of funds actually spent...."); *In re Marriage of Hansen*, 514 N.W.2d 109, 112 (Iowa App.1994) ("[T]he child support guidelines promulgated by the supreme court do not apply in fixing support in cases involving adult dependent children").

For the reasons so well stated by this Court in *McCarthy I* and *Goshorn*, we conclude that the Guidelines apply in calculating support for Kelly, an adult destitute child.

## IV.

Even if the Guidelines apply, appellee's financial concerns are well protected by the statutory scheme, in that the court is vested with discretion that allows it to depart form the strict application of the Guidelines under certain circumstances. Moreover, in the case of an adult destitute child, F.L. § 13–107 requires the court to consider "the financial circumstances of the individual." *See Drake,* 53 Cal.App.4th at 1157, 62 Cal.Rptr.2d 466 (noting that guidelines are not "fatally inflexible" with respect to adult disabled children and their parents).

In regard to an award of child support in an amount other than what is mandated by the Guidelines, F.L. § 12–202(a)(2) states:

(2)(i) There is a rebuttable presumption that the amount of child support which would result from the application of the child support guidelines set forth in this subtitle is the correct amount of child support to be awarded.

* * *

(iv) 1. If the court determines that the application of the guidelines would be unjust or inappropriate in a particular case, the court shall make a written finding or specific finding on the record stating the reasons for departing from the guidelines.

2. The court's finding shall state:

A. the amount of child support that would have been required under the guidelines;

B. how the order varies from the guidelines;

C. how the finding serves the best interests of the child; . . .

Even if the Guidelines apply, the court was certainly entitled to consider Kelly's earnings as a basis to modify the child support award and deviate from the Guidelines. As we noted, F.L. § 13–107(b) required the court to consider Kelly's financial circumstances. The Court of Appeals discussed con-

tribution from a minor child in *Drummond*, 350 Md. at 518, 714 A.2d 163, stating:

> Although section 12–202(a) does not specifically provide that income received by a child is to be considered as a factor in deviating from the guidelines, we agree with the Court of Special Appeals that the receipt of income by a child may be a relevant factor in determining whether "the application of the guidelines would be unjust or inappropriate." FL § 12–202(a)(2)(ii). A trial court has the discretion to deviate from the child support award calculated pursuant to the guidelines if, after considering income of a child, their application would be unjust or inappropriate in a particular case.

The court below determined that, under a strict application of the Guidelines, Kelly was entitled to support from appellee in the range of $795 to $827 per month, depending upon which figure the court accepted as to appellee's gross income. In order to depart from the Guidelines, a trial court must make specific findings to justify its ruling. *In re: Joshua W.*, 94 Md.App. 486, 501, 617 A.2d 1154 (1993); *see Tannehill v. Tannehill*, 88 Md.App. 4, 15, 591 A.2d 888 (1991). The court decided to deviate downward from the Guidelines, and awarded Kelly $150 per month (equal to $5 a day), because of Kelly's employment income. The court recognized that its decision to reduce appellee's monthly support obligation from $800 under the guidelines to $150 "essentially means [Kelly] can't live where she is living, she can't make her car payment." But, the court was of the view that the reduction was in Kelly's "best interest to continue her lifestyle the way it is."

We do not quarrel with the court's determination to adjust appellee's support obligation based on Kelly's increased employment income. Nevertheless, we are of the view that the court failed to explain adequately how such a substantial reduction comported with Kelly's best interest. Moreover, we conclude that the court erred or abused its discretion in its analysis of Kelly's expenses, and that error, in turn, affected the court's child support analysis. We explain.

 The court acknowledged that Kelly's lifestyle is certainly not "extravagant." It determined, however, that "it is not reasonable for this child to have her own place because she needs her mother to be with her when she is home...." The court explained: "I have got to deal with the reality, and the reality is, well, here I am saying you can't have two homes, you can't live in two different places. There can only be one home." The court continued:

> [Appellant] can close the door when she goes to sleep and get her privacy that way, but as odd as it might seem ... the fact that she has her own place and she has her own automobile is ... it is an option that doesn't necessarily mean that—and in this case I am finding doesn't mean that the father of this child has to pay for it.

> It is a choice that was made by the child's mother to ... broaden this child's life, put her out there in her own place, ... and get her some semblance of independence, but she can't be independent. She can't be.

Therefore, the court disallowed all expenses associated with Kelly's housing and her car. It said:

> It is either one or the other, and if she is independent, she can take care of herself. If she isn't, she can't. So I, for child support purposes, am determining that the expenses claimed for rent, gas, and electric, automobile payment, gasoline, insurance for the car, parking fee for two cars is ... not a reasonable expense under the context of the facts of this case, and so I am excluding them.

Appellant takes issue with the trial court's decision, claiming that the court had no legal authority to force Kelly to "relinquish" the "benefits of residing in her own apartment," nor any legal authority to order appellant to reside with Kelly. Moreover, appellant contends: "The Trial Court's Order that Kelly and her Mother must live together, violates the Mother's fundamental constitutional right of liberty and freedom from involuntary servitude, and is contrary to the protections provided to the Mother under the 13th Amendment of the U.S. Constitution."

Further, appellant asserts that, as a result of the court's ruling, she must now secure a larger apartment. Therefore, she argues that, at the very least, a proportion of the mother's expenses associated with procuring a larger apartment to shelter Kelly should have been apportioned to Kelly in calculating Kelly's reasonable monthly expenses. In addition, appellant states that the trial court erred because it did not include in Kelly's expenses the cost of her health insurance.[7]

Appellee insists that it is not reasonable for Kelly to have a car or her own apartment, and claims that the expenses for the car and apartment are "inconsistent" with "the evidence that Kelly is almost complete[ly] dependent on others for her daily needs." Consequently, appellee agrees with the trial court's finding that "Kelly is not able to use either the car or the apartment independently." Further, he claims that "Kelly's financial problems are due primarily to the fact that her mother has been using Kelly's money for her own expenses and has incurred expenses for Kelly that are not in Kelly's best interests."

We have not been provided with any authority to suggest that the court was entitled to *require* appellant, who is disabled, to reside with Kelly. Although the applicable statute contemplates financial support for a destitute adult child, so long as the parent has the means, it does not *compel* a parent physically to reside with such a child. Moreover, in this case

---

**7.** Appellant also claims error because the court refused to allocate support to replace furniture and clothes damaged by the ruptured water pipe. Appellant states: "The Trial court improperly reasoned that until Kelly actually incurred these additional costs to purchase a bed and clothing that her estimated replacement costs included in her financial statement were too speculative, and therefore disallowed this expense entirely."

This contention borders on frivolous. The court's decision regarding expenses due to the ruptured water pipe was not clearly erroneous. The court may consider *in futero* expenses if sufficiently documented. However, appellant's claim for $420 per month for the next year adds up to $5,040. The trial court acted within its discretion in finding that such an amount exceeded the necessary cost to replace furniture and that the expense was not properly documented.

appellant has no means to support Kelly financially. There-fore, we agree with appellant that, in calculating Kelly's reasonable expenses, the court should have allotted an appropriate amount for suitable housing.

To be sure, many mentally impaired people do manage to live independently or quasi-independently. Given the countless hours appellant continues to devote to Kelly's care, appellant's desire to house Kelly in a nearby apartment, so as to facilitate a semblance of independence and privacy for herself and Kelly, was hardly unreasonable. But, if the court believed Kelly was truly incapable of living alone, even with her mother's assistance, it should have considered the cost of alternative housing, such as a group home or other assisted living options.

On the other hand, in the event that appellant is willing to reside with her daughter, she is entitled to attribute to Kelly a portion of her housing costs, including rent, telephone, utilities, insurance, and related expenses. In that circumstance, then, the court should have included such costs as part of Kelly's reasonable monthly expenses.

Interestingly, the court's ruling requiring appellant to reside with Kelly flies in the face of its other conclusion—that appellant is not the legal guardian or custodian of Kelly, and has no legal relationship to her. On that basis, the court seemed to chastise appellant for commingling Kelly's funds in a "family account." It said:

[Appellant] is not her guardian. She is not her legal custodian. The mother has absolutely no right that I know of—I know of no law that permits the mother to commingle this child's money with her own and then spend it even though she is spending it for items like food, and clothes, other sundries, there is no law that permits the mother to do that.

We note that the court below suggested that appellant failed to present evidence of what a two-bedroom unit would cost. Clearly, appellant did not anticipate that the court would require Kelly to forfeit her apartment and move in with

appellant. Once the court decided to follow that course, however, it should have allowed appellant an opportunity to present evidence as to the additional cost to appellant of moving to a larger apartment, or the cost of an alternative housing arrangement for Kelly. Indeed, as an equity court focusing on Kelly's best interest, such an opportunity was an imperative.

F.L. § 12–102(e)(1)(ii) requires parents to maintain health insurance coverage for their child unless "the child has been or will be enrolled under other reasonable health insurance coverage, with the coverage to take effect no later than the effective date of disenrollment." F.L. § 12–102(e)(1)(ii) (1999); *see also Goldberg v. Miller*, 371 Md. 591, 606, 810 A.2d 947 (2002); *Rohrbeck v. Rohrbeck*, 318 Md. 28, 37, 566 A.2d 767 (1989). Appellee carried Kelly on his health insurance policy until she turned twenty-one. Therefore, on remand, the court should also consider Kelly's costs for health insurance in assessing her reasonable expenses, along with any medical expenses that are not covered under Kelly's health insurance. The court may also reconsider its ruling as to the car, based on the extent to which Kelly's use of the car serves to benefit Kelly.

In light of the foregoing, we shall vacate the Modification Order and remand for further proceedings. On remand, the circuit court should recalculate appellee's child support obligation after considering as part of Kelly's reasonable expenses the cost of Kelly's housing and health insurance. While the court shall use the Guidelines as its starting point in determining appellee's support obligation, a downward deviation may be warranted pursuant to F.L. § 12–202(a)(2)(iv) and F.L. § 13–107(b).

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**