REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 748

September Term, 2013

---

BERYL FITZZALAND a/ka/ BERYL ZAHN

v.

JEFFREY ZAHN

---

Woodward,
Kehoe,
Hotten,

JJ.

---

Opinion by Woodward, J.

---

Filed: August 1, 2014

Douglas Henry Zahn ("Douglas"), born December 1, 1993, and Thomas Andrew Zahn ("Thomas"), born January 16, 1997, are the children of Beryl Zahn, a/k/a Beryl Fitzzaland, appellant, and Jeffrey Zahn, appellee. Appellant and appellee were divorced on November 26, 2001. The divorce judgment awarded appellant and appellee joint legal custody of Douglas and Thomas, and gave appellee sole physical custody of the children, with liberal visitation for appellant. Child support was not awarded to either party.

From the fall of 2002 until 2010, appellant lived in the State of Washington. While appellant lived in Washington, Douglas was diagnosed with an autism spectrum disorder, anxiety, oppositional defiant disorder ("ODD"), and attention deficit/hyperactivity disorder ("ADHD"). Douglas and Thomas had limited contact with their mother while she resided in Washington, but upon her return to Maryland in 2010, appellant and appellee established an informal visitation schedule.

On April 30, 2012, appellee filed a Motion for Child Support in the Circuit Court for Frederick County. Appellee asked the court to: (1) find that Douglas was a destitute adult child; (2) order appellant to pay child support for Douglas and Thomas retroactive to the date of filing the motion; (3) order appellant to contribute to the children's extraordinary medical and other expenses retroactive to the date of filing the motion, and (4) order appellant to pay appellee's reasonable attorney's fees. Appellant opposed the motion, and later filed a motion requesting that she be awarded custody of Thomas.

After four days of trial, the circuit court, among other things, denied appellant's motion to change custody of Thomas, determined that Douglas was a destitute adult child,

and ordered appellant to pay appellee child support for both children and attorney's fees. Appellant appealed the circuit court's decision and presents three questions for our review, which we have slightly rephrased:

1. Did the circuit court err in determining that the parties' son, Douglas, is a destitute adult child?

2. Did the circuit court err in awarding child support for Douglas to appellee ?

3. Did the circuit court err in awarding attorney's fees to appellee?

For the reasons set forth herein, we answer each of these questions in the negative and affirm the judgment of the circuit court.

## BACKGROUND

On November 26, 2001, the circuit court entered a judgment of absolute divorce in favor of appellee against appellant. The judgment gave appellant and appellee joint legal custody of their children, Douglas and Thomas. Appellee was awarded sole physical custody of the children, and appellant received reasonable and liberal visitation. The divorce judgment did not include any child support requirements. Appellant was living in Virginia at the time of the divorce.

Sometime in the fall of 2002, appellant left Virginia and moved to the State of Washington. Appellant remained in Washington for eight years, and during that time had limited contact with Douglas and Thomas, occasionally speaking with them on the phone and exchanging emails. Douglas and Thomas never visited appellant in Washington, but

2

appellant visited Maryland twice, one time staying at appellee's home for part of her visit. In 2010, appellant relocated to Maryland, and the parties established an informal visitation schedule allowing Douglas and Thomas to see appellant every other weekend.

During the time appellant lived in Washington, Douglas was diagnosed with an autism spectrum disorder, anxiety, ODD, and ADHD.[1] Douglas was placed in an Individualized Education Program ("IEP") in school, in which he was allowed extra time to complete assignments and was permitted to have a scribe take notes for him and help him organize and complete his work. Douglas was enrolled in some honors classes in high school, and did well in school until his junior or senior year when his IEP ended. Without the additional support and supervision provided by the IEP, Douglas' grades dropped significantly.

In August 2011, appellee and Douglas filled out an application for Douglas to participate in services offered by the Maryland Department of Education, Division of Rehabilitative Services ("DORS"). DORS assists persons with disabilities to choose and maintain jobs, and provides various other services and counseling based on an individual's needs. On September 23, 2011, Douglas completed an initial assessment with vocational rehabilitation specialist, Ilana Novitzky, who determined that Douglas was qualified for DORS services. Novitzky categorized Douglas as a person with "the most severe disability," meaning that three or more areas of Douglas' life were affected by his disabilities, including

---

[1] Because appellant's legal challenges on appeal focus on Douglas, we will restrict our factual summary to Douglas' development, and discuss Thomas' role in the case only as necessary for the resolution of the issues presented.

3

social behavior and communication skills, life and independent living skills, as well as self-direction, planning, and organization.

On June 12, 2012, Douglas graduated from high school. The summer after his graduation, Douglas worked at appellee's office. On more than one occasion, appellee found Douglas playing video games in the bathroom instead of working, and, according to appellee, Douglas needed to supervised constantly in order for him to complete a task. Although appellee paid Douglas for his work, Douglas did not know how much money was in his bank account, and did not think that he could manage his own money. Douglas confirmed such inability to manage money by spending the money he made over the summer on video games and applications for his computer and iPad.

In September 2012, Douglas began a community living skills training program at DORS' s Workforce Technology Center ("WTC") in Baltimore. The center trains students in life skills including cooking, cleaning, basic money management, and social skills, and provides a career assessment designed to help the students determine what employment they could realistically attain. The career assessment showed that Douglas would need accommodations for successful employment, and he eventually received the help of a job coach in applying and interviewing for work. While Douglas was attending the WTC, he was placed on a behavior plan after having social interaction problems and offending others at the center. He was warned that, if another inappropriate or offensive conversation occurred, he would not be permitted to complete the program. In December 2012, however,

Douglas completed the WTC program.

In January 2013, Douglas began receiving a new service through DORS called employment development skills ("EDS"), in which he worked at Goodwill as a way to develop his employment experience. The same social and interpersonal problems arose at Goodwill as had occurred at the WTC, and the store's manager had to speak with Douglas on a regular basis about his inappropriate social interactions. Douglas also arrived late to his job at Goodwill "almost every time he would get there."

Douglas was able to obtain a driving learner's permit with the help of DORS services, and received assistance from a job coach. As of April 2013, however, Douglas stopped receiving DORS benefits, because appellee had not yet paid the complete DORS bill from the previous year, and Douglas was ineligible for new services until payment was complete. DORS cost appellee $3,400.00 for a year of services.

Douglas currently resides at appellee's home. Douglas is responsible for his own personal hygiene, but cannot have needed orthodontic work performed, because he does not brush his teeth enough. Douglas is also responsible for taking his medication daily, but admits that he sometimes forgets and that appellee or his stepmother must remind him to take it. Appellee also has to remind Douglas to do his chores and to complete those chores when he leaves them unfinished. Although Douglas interviewed for at least three jobs, he was not employed at the time of the hearing on appellee's Motion for Child Support.

On April 30, 2012, appellee filed a Motion for Child Support in the circuit court. He

5

asked the court to, among other things: (1) find Douglas to be a destitute adult child; (2) order appellant to pay child support for both children retroactive to the date of filing the motion; (3) order appellant to contribute to the children's extraordinary medical and other expenses retroactive to the date of filing the motion, and (4) order appellant to pay appellee's reasonable attorney's fees. On June 5, 2012, appellant filed an answer to appellee's Motion for Child Support, and subsequently amended her answer on June 11, 2012.

Trial on appellee's Motion for Child Support began on March 12, 2013, with appellee presenting the testimony of Novitzky as an expert in vocational rehabilitation. The case could not be concluded that day, and was continued to April 25, 2013. Prior to the second day of trial, on March 20, 2013, appellant filed a Petition to Enforce Agreement, or Alternatively, to Modify Custody/Visitation ("Custody Petition"). In the Custody Petition, appellant requested that the circuit court enforce the parties' original Marital Settlement Agreement that gave the parties joint physical custody of Douglas and Thomas and required appellee to pay appellant child support. Alternatively, she requested that the court grant her sole or joint custody of Thomas, establish a formal access schedule for her to see Douglas and Thomas, and award her attorney's fees.

On March 26, 2013, appellee filed an Opposition to [Appellant's] Petition to Enforce Agreement, or Alternatively to Modify Custody/Visitation ("Opposition"). Appellee asked that appellant's Custody Petition be denied, that appellee be awarded attorney's fees, and that the trial scheduled for April 25, 2013 go forward. The Opposition also asserted that

appellant's motion "was filed solely as an attempt to avoid payment of child support."

The same day, appellee filed a Motion to Dismiss [Appellant's] Petition to Enforce Agreement, or Alternatively to Modify Custody/Visitation ("Motion to Dismiss"). In the Motion to Dismiss, appellee argued that the Marital Settlement Agreement was superceded by the November 21, 2001 divorce judgment, noting that the judgment incorporated the Marital Settlement Agreement *except* for those provisions relating to Douglas and Thomas. Appellee also argued that there had not been "any material changes in circumstances affecting Thomas' (and Douglas') well-being" that would warrant a change in custody. On April 9, 2013, appellant filed a response to appellee's Motion to Dismiss.

On April 25, 2013, trial on appellee's Motion for Child Support resumed. At that time, the circuit court also considered the motions the parties filed after the March 12, 2013 hearing. The court denied appellee's Motion to Dismiss, and appellee decided to litigate appellant's Custody Petition in the same proceeding as his Motion for Child Support.

The parties were again unable to conclude the trial on April 25, 2013, and the case was continued to May 1, 2013. On May 1, 2013, testimony was completed, and trial counsel presented closing arguments on May 2, 2013. That same day, May 2, 2013, the circuit court orally presented its findings of fact and conclusions of law. In pertinent part, the court held that (1) circumstances had not changed to warrant a change of physical or legal custody of Thomas, but that appellee would have final decision-making authority, (2) Douglas was a destitute adult child, (3) appellant would pay child support to appellee in the amount of $

7

850.00 per month for both children, to be withheld from her earnings as of May 1, 2013, (4) appellant owed child support arrears in the amount of $10,200.00, which could be paid by adding $50.00 per month to appellant's child support payments and (5) appellant would pay $7,500.00 to appellee in attorney's fees. The court's written order was entered June 20, 2013.

Appellant noted her appeal to this Court on May 31, 2013, and filed a supplemental notice of appeal on June 28, 2012, after the circuit court's final written decision was entered.

## DISCUSSION

### I. The Destitute Adult Child Determination

Appellant argues that the circuit court erred in determining that Douglas is a destitute adult child, by "improperly equat[ing] Douglas' mental diagnosis and his current lack of employment with being a destitute adult child." According to appellant, the court was required to find a causal link between Douglas's mental infirmity and the lack of capacity to be self-supporting, which it could not do, because the evidence from the trial supported the conclusion that Douglas could obtain employment and become self-supporting. Appellant pointed to the testimony of appellee's expert, Novitzky, regarding Douglas's above average test results from his career assessment at WTC, and argued that Novitzky never testified that Douglas could not be self-supporting in the future. Appellant argues that the circuit court also failed to consider Douglas's total expenses, which the court was required to review.

Appellee responds that there was ample evidence in the record for the circuit court to

determine that Douglas was a destitute adult child. Appellee contends that the determination of whether a person is a destitute adult child is not a permanent one, and thus appellant's contention that Douglas could become self-supporting in the future is irrelevant. Appellee additionally argues that, even if Douglas could attain and keep a job, simply having a job would not preclude a finding of destitute adult child if Douglas was still not self-supporting.

We review the circuit court's determination that Douglas is a destitute adult child for clear error. *Corby v. McCarthy*, 154 Md. App. 446, 484 (2003). Under the clearly erroneous standard, we look at the record in the light most favorable to the prevailing party, and if there is any competent, material evidence to support the circuit court's findings of fact, we cannot hold that those findings are clearly erroneous. *Mayor & Council of Rockville v. Walker*, 100 Md. App. 240, 256 (1994), *cert. dismissed*, 337 Md. 360 (1995).

Maryland Code (1984, 2012 Repl. Vol.), § 13-102(b) of the Family Law Article ("F.L."), creates a statutory duty for a parent to support his or her destitute adult children so long as the parent has sufficient means to provide that support. *See also Cutts v. Trippe*, 208 Md. App. 696, 703 (2012). F.L. § 13-101(b) defines a destitute adult child as "an adult child who: (1) has no means of subsistence; and (2) cannot be self-supporting, due to mental or physical infirmity."

In reviewing each of the statutory factors in F.L. § 13-101(b), "only resources that are currently available to a child should be considered . . . ." *Cutts*, 208 Md. App. at 704. A child's potential for employment and his ability to obtain future resources take no part in the

circuit court's analysis. *See id.* at 704-05 (holding that a trust fund not currently available to the child could not be considered as part of a destitute adult child analysis); *Presley v. Presley*, 65 Md. App. 265, 278-79 (1985) (holding that a child's potential to become a tenured, rather than a probationary employee, had no effect on her current financial situation, and was thus "completely irrelevant").

Having set out the basic framework in which the destitute adult child analysis takes place, we turn to the first prong of F.L. § 13-101(b)—whether the adult child "has no means of subsistence." What encompasses "no means of subsistence" has been expanded to "include not only individuals with no means of subsistence, but also those with expenses that exceed their resources." *Cutts*, 208 Md. App. at 708; *see also Corby*, 154 Md. App. at 488 (holding that an individual with an income of $22,000.00 qualified as a destitute adult child); *Presley*, 65 Md. App. at 271, 278-79 (holding that a individual's income of $14,200.00 did not automatically preclude her from being adjudicated a destitute adult child).

Thus, there are two types of individuals who may qualify as having no means of subsistence:

> First, there are those with no financial resources or earning capacity, and thus by definition destitute. Second, there are individuals who have financial resources, but nevertheless are destitute due to a net deficit between reasonable living expenses and financial resources—a finding that can only be ascertained by conducting a balancing analysis [of financial resources against reasonable expenses] . . . . [R]equiring courts to go through the motions of a balancing test in cases where a child has no source of income would be meaningless; if a child has no resources whatsoever, any showing of reasonable expenses will, by default, constitute a deficit.

10

*Cutts*, 208 Md. App. at 709-10.

Douglas falls into the first category, to wit, a person who has no financial resources, and thus, by definition, has "no means of subsistence." *See id.* at 709. In *Cutts v. Trippe*, we held that nineteen- year- old Sarah, who had been diagnosed with "mild mental retardation" and had attended a school for students with an IQ lower than seventy, had "no means of subsistence" because she was not employed, did not receive disability benefits or other assistance, and did not have any other available financial resources. *Id.* at 700, 709.

Similarly, in the instant case, at the time of trial Douglas was not employed and had no other income or means of support.[2] Although appellee had applied for Supplemental Social Security Income for Douglas, no determination had been made concerning his eligibility as of the time of trial. In addition, Douglas testified at trial that his expenses for food, clothing, and shelter were paid or provided for by appellee and appellee's wife. Consequently, as was the case in *Cutts*, Douglas has "no means of subsistence."

Appellant's contention that the circuit court erred by not considering Douglas' expenses fails in light of our determination that Douglas has no financial resources. As we stated in *Cutts*, once the circuit court has determined that the adult child has no financial resources, "there was no need for the trial judge to go any further and weigh [the adult child's] financial resources against [his] expenses, because there were simply no financial

---

[2] Douglas had applied for a position at Wendy's as of the March 12, 2013 trial date, but appellee informed the court at the hearing on April 25, 2013 that Douglas had not been offered the job.

11

resources to consider." *Id.* at 709. Thus, Douglas' expenses would only be a part of the "no means of subsistence" analysis if Douglas had financial resources at the time of trial. In the absence of such resources, the circuit court did not err in declining to balance Douglas' reasonable expenses against his non-existent financial resources.

Next we consider the second prong of F.L. § 13-101(b)—whether Douglas cannot be self-supporting due to mental or physical infirmity. Because we have already determined that Douglas has no means of subsistence, it follows that he is not self-supporting. Thus the question we must answer is whether the circuit court was clearly erroneous in its finding that Douglas' current inability to be self-supporting is due his autism and other disabilities.

The record demonstrates that Douglas' disabilities pervade his day-to-day life and are the cause of his inability to be self-supporting. Although multiple witnesses testified to the effects of Douglas' disabilities on his ability to be self-supporting, appellee's expert in vocational rehabilitation, Novitzky, alone presented ample testimony to demonstrate this causal link. Accordingly, we will summarize her opinions, observations, and conclusions about Douglas here.

Novitzky worked with Douglas through DORS, and met with him four times prior to trial. She determined that Douglas was an individual "with the most severe disability," and explained:

> An individual with most severe disability, that means that three or more areas of life are affected by that disability. And so in Doug's case I believe that three or more areas were affected such as social behavioral area, communication skills area, life skills, independent

12

living skills, as well as self-direction, planning, organization, things like that.

Novitzky testified that Douglas received a career assessment and four months of community living skills training at the WTC, which was intended to help Douglas learn to live on his own. Novitzky explained that the career assessment revealed that Douglas' autism, anxiety, and ODD placed limits on Douglas, such as difficulty in sustaining his attention, being easily distracted, and having limited interpersonal skills. The career assessment also demonstrated, and Novitzky agreed, that Douglas would need accommodations for successful employment. For example, Douglas was provided with a job coach to help him find and maintain employment, because Douglas lacked the ability to plan and submit an application or go to an interview on his own.

Novitzky also testified that Douglas had a number of social interaction problems while attending the WTC, including repeatedly engaging in offensive conversations with others at the center. She stated that Douglas had similar issues once he left the WTC and began his EDS training at Goodwill. According to Novitzky, Douglas was almost always late arriving to Goodwill, and "[h]e had some issues. Again, social, interpersonal type of behaviors that were not very appropriate and [Douglas'] case manager has talked to him about that on a regular basis." When asked whether Douglas' behavior at Goodwill and the WTC were consistent with his autism, Novitzky stated that they were. Novitzky also stated that "those are behaviors that are typical of someone who has autism and . . . autism is a lifelong disorder, so you have to constantly work on it and I believe he could improve. However

13

that's something that he will, may always struggle with."

Novitzky emphasized how difficult it would be for Douglas to obtain and then maintain employment due to his autism and the related problem that he has with social interactions:

| [Appellee's Trial Counsel]: | [ ] What is, what are Doug's impediments to his being able to be employed in a job that would enable him to be self-supporting? |
|---|---|
| [Novitzky]: | Okay. Well, that will be number one, his social skills. His ability to communicate appropriately. His behavior when it comes to socialization and then the self-management, self-direction, being on time, planning for the day on a daily basis, you know, driving or getting to work, ability to stay, stay there as, as well as his life skills. Being able to kind of manage his day. |
| [Appellee's Trial Counsel]: | Okay. |
| [Novitzky]: | Those are all skills. |
| [Appellee's Trial Counsel]: | **And in your opinion is he currently able to, ah, let's start with live independently?** |
| [Novitzky]: | **At this point I don't think so. No, he doesn't.** |

\* \* \*

| [Appellee's Trial Counsel]: | Okay. And we've talked a bit about the social skills. Can you explain to the Court why those skills are important in the context of employment? |
|---|---|
| [Novitzky]: | Okay. Well, they're very important because one |

14

has to communicate in a proper manner with a supervisor, with co-workers, and depending on the job, with, ah, with public. So if for, if a person is, displays inappropriate comments or conversations or, um, you know, cannot establish a, a proper relationship he will not be able to maintain a job.

[Appellee's Trial Counsel]: And as I understood your testimony that's an area that Douglas has problems with.

[Novitzky]: Right. That, that is one of the main barriers to, ah, for successful employment without supports at this time.

[Appellee's Trial Counsel]: **Okay. And that is related to his diagnosis of autism[?]**

[Novitzky]: **Yes.**

\* \* \*

[Appellee's Trial Counsel]: **In your opinion, is Douglas currently able to work on an independent, in an independent, unsupported work environment and earn sufficient money to be self-supporting?**

\*\*\*

[Novitzky]: **No. In my opinion at this time he is not able to be completely self-supported and live independently and, and self-support himself. At this point, no.**

(Emphasis added).

Despite Novitzky clearly concluding that Douglas was currently unable to be self-supporting due to his disabilities, appellant points to parts of Novitzky's testimony that

15

appellant contends required the court to determine that Douglas can be self-supporting. Specifically, Novitzky testified on cross-examination that Douglas scored above average on a variety of the career assessment tests, including computer literacy, timed typing, mail sorting, collating materials, circuit board inspection, and message taking. She also testified that Douglas would be able to work in a data entry or writing job independently. Appellant further points out that Novitzky never testified that Douglas could not be self supporting in the future, and did testify that Douglas is able to work, but "we're not sure at this point if he is able to self-support himself completely independently."

Appellant misses the key factors of Novitzky's testimony, however, because the analysis of whether the adult child's disability impedes him from being self-supporting allows consideration of only the child's *current* abilities. As discussed above, Novitzky does not think that Douglas is currently able be self-supporting due, in main part, to his autism and the resulting difficulties that he has with social interactions. Novitzky stated that "[Douglas] has good cognitive skills. However the other weaknesses that he have [sic], the social skills and the barriers like that, that could really affect his ability to work full-time, or [ ] successfully on an ongoing basis." That Novitzky believes Douglas could become self-supporting someday does not change the analysis that he currently cannot be self-supporting due to his disabilities.

Having reviewed the record and determined that Douglas has no means of subsistence, and cannot be self-supporting due to his autism and other disabilities, we find no error in the

circuit court's conclusion that Douglas is a destitute adult child.

## II. Child Support

Appellant contends that the circuit court erroneously awarded appellee child support for Douglas. We disagree.

The General Assembly has made it a misdemeanor for a parent with sufficient means not to provide support to his or her destitute adult child. *See Stern v. Stern* 58 Md. App. 280, 293-94 (1984). In *Smith v. Smith*, the Court of Appeals interpreted this law, and stated:

> At its 1947 session the Legislature enacted an act now codified as § 97 of Art. 27, Code (1957) [now F.L. § 13-102], making it a criminal offense for a parent, possessing the means, to fail to provide for a destitute adult child where mental or physical infirmity makes it impossible for the child to care for itself. **The passage of this act is a clear indication of legislative intent to place failure to support an incapacitated child on equal footing with failure to support a minor child**.

227 Md. 355, 360 (1962). This Court in *Stern v. Stern* determined that, because incapacitated adult children are on equal footing with minor children, "it follows that the procedure and remedies for the enforcement of that right must also be 'on equal footing.'" 58 Md. App. at 295. In *Goshorn v. Goshorn*, we held that this "equal footing" required that the child support guidelines be used in determining the amount a parent must pay to support a destitute adult child. 154 Md. App. 194, 218-19 (2003), *cert. denied*, 380 Md. 618 (2004). Thus, once a child has been determined to be a destitute adult child, the court's next step is to apply the child support guidelines in F.L. § 12-204 to ascertain the support obligation a parent owes to that child. *Id.* at 218. In an appeal of the award for child support, "we review the trial

17

court's factual findings for clear error, while each ultimate award is reviewed for abuse[] of discretion." *Reynolds v. Reynolds*, 216 Md. App. 205, 218-19 (2014).

In the instant case, appellant first argues that, because Douglas was improperly adjudicated a destitute adult child, child support guidelines should not have been considered. As explained above, however, Douglas was properly determined to be a destitute adult child, and thus the circuit court applied the correct legal standard—the child support guidelines under F.L. § 12-204.

Appellant next contends that "there was no analysis regarding the total reasonable living expenses of Douglas[, and as] a result, [] [a]ppellee failed to meet his burden and child support should have been denied." Up to a combined monthly income of $15,000, F.L. § 12-204 requires that the child support determination be based on the parents' incomes, rather than the expenses of the child. F.L. § 12-204(d)-(e). Only expenses associated with health care insurance, child care, extraordinary medical expenses, expenses for private or special schools, and transportation expenses may be considered beyond the parents' incomes. F.L. § 12-204(g)-(i); *see also Horsley v. Radisi*, 132 Md. App. 1, 26 (2000) ("[T]he plain and unambiguous language of the statute authorizes the court to supplement the Guidelines obligation only for certain categories of expenses . . . [and] [i]t follows that the court was not entitled to add to the Guidelines obligation the cost of discretionary activities . . . .").

Appellant and appellee submitted detailed financial statements, along with extensive documentation, for the court to review. In his oral ruling on the award of child support, the

trial judge accounted for both appellant and appellee's gross income, health insurance premiums, and extraordinary medical expenses when calculating the amount of child support to award. Because the parties' combined gross income did not exceed $15,000, the trial court correctly did not consider Douglas' reasonable living expenses in its determination of the child support award for Douglas. Without any contention by appellant that the court's determination of child support was otherwise inaccurate, we conclude that the circuit court did not err or abuse its discretion in awarding child support to appellee for the parties' destitute adult child.[3]

## III. Attorney's Fees

---

[3] The child support guidelines employed by the trial court indicated that appellant should pay appellee $1,136 per month in child support for both Douglas and Thomas. The court, however, deviated from the statutory guidelines by reducing appellant's child support obligation to $850 per month. *See* Md. Code (1984, 2012 Repl. Vol.), § 12-202(a)(2)(ii) of the Family Law Article ("F.L.") (stating that "[t]he presumption [in favor of the guidelines] may be rebutted by evidence that the application of the guidelines would be unjust or inappropriate in a particular case"). The court stated the reason for such deviation:

> I can't overlook the fact that there is another child in [appellant's] household that although she is by testimony higher functioning than Douglas and Thomas, she still is autistic, [ ] still is a special needs child and there are expenses for her. . . . [I]f I impose the guidelines and [appellant] can't make it, how is Thomas going to have significant time with [appellant] during his access? How's [appellant] going to do [any]thing--we, we, they talked about him being bored. How's he gonna, she gonna do anything with him? Even take him out for dinner or what-have-you. And I find that there is a need for deviation.

Appellee did not file a cross-appeal challenging the trial court's deviation from the child support guidelines under F.L. § 12-202(a)(2).

19

The circuit court awarded appellee attorney's fees after concluding that "there was no substantial justification for bringing [the Custody Petition] and although [appellant] backed off [she] did not back off all the way and it caused this case during the course of it to be inflated and inflamed." The court stated that the unjustified Custody Petition extended the case two days longer than otherwise would have been necessary. Appellant was therefore ordered to pay appellee $7,500.00 out of $33,642.12 in total attorney's fees incurred by appellee.

Appellant argues in the instant appeal that the circuit court erroneously awarded attorney's fees to appellee, contending that the court "failed to articulate the specific manner by which it calculated [the $7,500.00] award." According to appellant, appellee did not present evidence concerning appellee's attorney's fees for the specific trial dates that the circuit court concluded were unnecessary, and the $7,500.00 award exceeded what would have been the total cost of attorney's fees for those two unnecessary days of trial.

Appellee responds that the award of attorney's fees was appropriate, because the circuit court determined that appellant's mid-trial Custody Petition—which requested a change of custody for Thomas, an access schedule for both children, and reasonable counsel fees—was unjustified. Appellee contends that circuit court knew appellee's counsel's hourly rate, and could have easily determined the total cost of the trial based on that rate, the number of hours the parties were in court, and the court's estimation of hours spent preparing for trial.

We review the trial court's award of counsel fees in a domestic case for abuse of discretion. *Steinhoff v. Sommerfelt*, 144 Md. App. 463, 487 (2002). Pursuant to F.L. § 12-103:

> (a) *In general.* — The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:
>
> (1) applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties; []
>
> * * *
>
> (b) *Required considerations.* — Before a court may award costs and counsel fees under this section, the court shall consider:
>
> (1) the financial status of each party;
>
> (2) the needs of each party; and
>
> (3) whether there was substantial justification for bringing, maintaining, or defending the proceeding.
>
> (c) *Absence of substantial justification.* — Upon a finding by the court that there was an absence of substantial justification of a party for prosecuting or defending the proceeding, and absent a finding by the court of good cause to the contrary, the court shall award to the other party costs and counsel fees.

The court is required to consider and balance all of the factors in F.L. § 12-103(b) before awarding attorney's fees. *See Sczudlo v. Berry*, 129 Md. App. 529, 549-50 (1999). Additionally, in determining the appropriate amount of an attorney's fee award, the court should consider "(1) whether the [fee amount awarded] was supported by adequate testimony or records; (2) whether the work was reasonably necessary; (3) whether the fee was

21

reasonable for the work that was done; and (4) how much can reasonably be afforded by each of the parties." *Lieberman v. Lieberman*, 81 Md. App. 575, 600-02 (1990).

Appellant concedes that the circuit court applied the required factors under F.L. § 12-103(b). Appellant, however, contends that the amount of the award was arbitrary, because (1) appellee's records of attorney's fees did not include charges past the second day of trial, and (2) the amount of the award, calculated at the hourly rate of appellee's counsel, far exceeded the two extra days of trial time, which the court determined was unnecessarily caused by appellant's Custody Petition. We disagree, and hold that the circuit court complied with all the requirements of *Lieberman* in determining the amount of the attorney's fee award, and thus such amount was not arbitrary.

As to the first *Lieberman* factor, whether the fee amount awarded was supported by adequate testimony or records, the circuit court was provided detailed records of appellee's legal fees from April 2012 through April 24, 2013, the day before the second day of the four-day trial. The records delineate the tasks appellee's attorney performed in preparing and litigating appellee's case, and the time each task required. Included in these records were appellee's counsel's hourly rate of $360.00 per hour, the time expended drafting the responsive pleadings to appellant's Custody Petition, the preparation time for the second day of trial, and the time charged for the first day of trial.

Although the records submitted to the circuit court did not include the fees appellee incurred after April 24, 2013, the records do provide detailed information concerning the

time appellee's counsel required to prepare for and litigate the case up to April 24. Thus, considering the time recorded for the first day of trial, the preparation time that appellee's counsel logged in for the second day of trial, and the time appellee's counsel expended in drafting the Opposition to appellant's Custody Petition and the Motion to Dismiss the Custody Petition, there was sufficient information in the record from which the court could determine, directly and inferentially, the appropriate amount for an attorney's fee award.

Moreover, with an hourly rate of $360.00, appellee's counsel would have had to work slightly over twenty hours to reach a $7,500.00 fee. Appellant does not dispute the trial court's determination that her unjustified Custody Petition caused two unnecessary trial days. The records before the trial court reflect that appellee's counsel charged her nine hours for the first trial day, 1.5 hours for preparing the Opposition and Motion to Dismiss, and 5.4 hours preparing for the second day of trial. Given this information, along with the trial judge's personal knowledge of the time expended for each day of the trial, the court could reasonably conclude that the time expended by appellee's counsel in response to appellant's Custody Petition exceeded twenty hours.

As to the second *Lieberman* factor, whether the work was reasonably necessary, the circuit court emphasized that appellant had no justification for bringing her Custody Petition midway through the litigation, stating that

> this case could have been tried in a half a day [rather than the four days it actually took to complete]. However I find that it should have been tried in no more than two. And I award, ah, and I took into consideration counsels' hourly rate and I'm going to award attorneys'

23

fees in the amount of $7,500. . . . I find that because of the timing of the filing that it was, that the impetus of the filing was to avoid paying child support and therefore I lay this at the mother's door and award the $7,500 attorneys' fees against mother in, on, in favor of father.

The trial court also noted that the Custody Petition "created additional work and preparation and trial time." Because appellee's counsel was required to respond to the unjustified Custody Petition, and because appellant "did not back off all the way" fighting for custody of Thomas, thus forcing appellee to litigate that additional issue, the work appellee's counsel performed was reasonably necessary.

The third *Lieberman* factor, whether the fee was reasonable for the work done, was not specifically addressed, but we note that the trial judge was familiar with the practice of family law and was aware of the usual hourly rate for the legal services performed by an attorney with the experience of appellee's counsel. In addition, as we described under the first *Lieberman* factor, at a rate of $360.00 per hour, the $7,500.00 figure accurately represents the additional time that appellee's attorney had to expend to respond to appellant's Custody Petition, prepare for trial on the Custody Petition, and actually litigate the Custody Petition in court.

Finally, the circuit court considered the fourth *Lieberman* factor, how much could reasonably be afforded by both parties. The court noted that appellant had to support her autistic daughter in addition to Douglas and Thomas, and stated that the needs of appellant and appellee were "somewhat similar" given that each party was "doing well with your professions[, b]ut you're not getting rich . . . ." By limiting the award to only the portion of

24

the litigation that the court determined lacked substantial justification, the court took into account the relatively equal financial status of the parties.

In sum, after applying the required factors under F.L. § 12-103(b) and considering the *Lieberman* factors, the circuit court awarded appellee $7,500 of attorney's fees out of a total of $33,642.12 incurred by appellee in the instant case. We find no error or abuse of discretion in the award of attorney's fees to appellee.

> **JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**